**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**HOWARD QUARRIES, INC.,**
**Respondent.**

**No. 18123.**

United States Court of Appeals
Eighth Circuit.

June 22, 1966.

Clarice R. Feldman, Atty., N. L. R. B., Washington, D. C., for petitioner. Arnold Ordman, Gen. Counsel, N. L. R. B., Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Elliott Moore, Atty., N. L. R. B., Washington, D. C., were with her on the brief.

Harry L. Browne and Clifton L. Elliott, of Spencer, Fane, Britt & Browne, Kansas City, Mo., for respondent and filed brief.

Before MATTHES, MEHAFFY and GIBSON, Circuit Judges.

MEHAFFY, Circuit Judge.

This case is here upon a petition of the National Labor Relations Board for enforcement of an order reported at 150 N.L.R.B. # 83. This court has jurisdiction.

Howard Quarries, Inc. is a Missouri corporation located in Sedalia, Missouri with its principal business being the operation of various rock quarries and the processing of commercial stone. The quarry involved here is located at Sweet Springs, Missouri, and at the time of the alleged violations was operating two shifts with a payroll of twenty-nine employees.[1]

The issue in this case is whether there is substantial evidence to support the Board's findings that respondent, Howard, violated § 8(a) (1) and (3) of the National Labor Relations Act, as amended, by unlawfully interrogating and threatening employees during a union authorization campaign and by discriminatorily selecting employees for layoff.[2] Accordingly, we have reviewed the entire record. We reverse both findings. 29 U.S.C.A. § 160(f); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

§ 8(a) (1)—Interrogation

On May 11, 12, 13 and 15, 1964, Teamster Local 534 began soliciting authorization cards from Howard's employees.[3] The solicitations were openly conducted on a country road near the quarry entrance but some quarter mile from the buildings and actual operations. Howard's supervisors were aware of the union activity and with the exception of the interrogations were otherwise unconcerned in view of organizational efforts sporadically conducted over the past fifteen years and the continuous picketing of Howard the preceding year.

During this four day period, supervisor J. A. McCollom, day foreman Lloyd Davis, and night foreman Vern Garrison casually observed the union's activity and informally questioned eleven employees as to whether or not they had signed union cards. It was established that nine employees were questioned once and two employees were questioned twice with the time involved being about one to two minutes per conversation. The questioning occurred on the job and usually in the parking lot during shift changes.

On May 11 Charles L. Williams, Lloyd Goodwin and Clyde Morney signed cards and as they reported for the night shift were met in the parking lot by McCollom. Each was asked if he had signed a union card to which Williams and Goodwin replied affirmatively. Morney was found to have answered that he had only signed a card about a strike and had marked it "no," to which McCollom injected "You have been with us a long time you know." This negative answer is not based upon the direct examination of Morney who did in fact tell McCollom he had signed a union card.[4] Although Goodwin and Wil-

---

1. A day shift operated from 4:00 a. m. to 2 p. m. and a night shift operated from 2:00 p. m. to 11:30 p. m.

2. 29 U.S.C.A. § 158(a) (1) and (3):
 "(a) It shall be an unfair labor practice for an employer—
 "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 \* \* \* \* \*
 "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization \* \* \*."

3. Unless otherwise stated, all dates are 1964.

4. "Q. (By Mr. Dowd) Do you recall the conversation between you and McCollom? A. Yes.
 "Q. What was that? A. He asked did I sign the card.
 "Q. What did you say? A. I told him I signed a little small one and I told him at that time.
 "Q. *Then you say you signed one?* A. *I did.*
 "Q. *That is what you said to him?* A. *I did.*
 "Q. Did he say anything else to you? A. I believe he said, 'You have been around a long time.'
 "Q. Was that all that was said? A. Yes." (Emphasis ours.)

liams testified that they only heard Mc-Collom say that Morney had been around for a long time, the examiner preferred to accept the testimony of James A. Mullins who overheard the Morney-McCollom conversation and believed Morney to have lied about signing.[5] This reliance by the examiner is relative, we think, to his assumption that Morney was not laid off because Howard believed he had not signed a card and harbored no union sympathies.

The same day Mullins told McCollom he had not signed and did not plan to. Mullins did, however, sign a card on May 12 as did day workers Raymond C. Johnson and Bernard Abbott. Mullins later told foreman Lloyd Davis that he had signed. On May 13, Johnson informed McCollom that both he and Abbott had signed cards. McCollom commented, "I am surprised at you, I did not think that of you, you being one of the oldest men here." The following day McCollom made a similar comment to Johnson and added, "if you wanted to quit, why didn't you?" Johnson replied, "I might do that if you are not satisfied with what I did." McCollom then stated, "what do you think the people will think of you sitting and talking with the union men?" McCollom added, "I did not ask you to quit, I don't want you to." On May 13, McCollom asked Abbott if he "got signed up yesterday afternoon." Abbott said he had. McCollom asked "what [Abbott] expect[ed] to gain," and "what [the union] promise[d] [him]." Abbott answered "nothing," to which McCollom commented, "I can't understand you older guys signing up, the younger men I could figure it out, but not you older men."

On May 12, day workers Virgil Smith and Alvin O. Staten signed cards as they left work. The next day McCollom inquired if they had signed. Both replied that such was unnecessary as they already belonged to the union. Staten then showed McCollom his union card.

Night worker Merrill Allison signed a card on May 11. The following day night foreman Vern Garrison asked if "all the boys had signed up." Allison said he thought "the biggest part of them had." Garrison shook his head and walked off. Day foreman Lloyd Davis asked Allison the same question and got the same reply. Davis informed Allison that he did not think "it would do a nickel's worth of good."

Day worker Robert A. Martin signed a card on May 12 but after questioning by foreman Davis, Martin denied signing. Martin also told McCollom that he had not signed to which McCollom commented, "that's a good boy." Doris H. Tincher and Walter H. Day signed cards on May 15. Day was never questioned, while Tincher, in reply to McCollom's question of "what are they signing at the quarry entrance with the union men," replied, "some kind of negotiation card." McCollom remarked that unions were no good and "they will get you in trouble." Tincher "kind of agreed." James Freddy Chitwood signed May 11 and Jim Allen Halphin signed May 12. Neither was questioned.

The examiner found that these comments "reasonably show antiunion animus and warrant the inference that the interrogations were far from casual or isolated incidents but rather were deliberate and of the broad nature and extent which the Board has often found to be inherently coercive." We do not agree. It is well established that otherwise legal acts cannot be the basis for an inference of antiunion animus. N. L. R.

---

5. "Q. Did you ever hear any conversation between McCollom and any employee about signing union cards? A. Yes.

"Q. When? A. May the 11th.

"Q. Who did you hear a conversation between? A. I heard part of the conversation between Clyde and Dutch, Clyde Morney.

"Q. Did you hear anything at this time? A. To the best of my knowledge he asked Clyde if he signed a union card, Clyde said no, he signed a little piece of paper that asked if he wanted to go on a strike or not on a strike and he marked no."

B. v. Colvert Dairy Products Co., 317 F. 2d 44 (10th Cir. 1963). And, from our examination of the record, we are unable to allow this inference the burden of supporting a § 8(a) (1) violation. True, about one-third of the employees were asked if they had signed union cards with the inquirer expressing various feelings commensurate with the answers. But all were casual and brief and conducted in informal surroundings. Not only do we fail to find evidence that would support feelings of coercion and interference but also that no employee considered himself restricted or limited either in his right of self-expression or his freedom to participate in self-organization. N. L. R. B. v. I. Posner, Inc., 342 F.2d 826 (2nd Cir. 1965); S. H. Kress & Co. v. N. L. R. B., 317 F.2d 225 (9th Cir. 1963); J. S. Dillon & Sons Stores Co. v. N. L. R. B., 338 F.2d 395 (10th Cir. 1964). And, "interrogation as to who has signed cards is not anti-union pressure." N. L. R. B. v. Covington Motor Co., 344 F.2d 136, 137 (4th Cir. 1965) and cases there cited.

 Mere display of antiunion hostility during the course of an organizational campaign is to be expected and does not constitute an unfair labor practice. Fort Smith Broadcasting Co. v. N. L. R. B., 341 F.2d 874, 879 (8th Cir. 1965). Statements that the union would not be advantageous are protected and do not constitute an unfair labor practice. Surprenant Mfg. Co. v. N. L. R. B., 341 F.2d 756 (6th Cir. 1965); N. L. R. B. v. Superex Drugs, Inc., 341 F.2d 747 (6th Cir. 1965). What we have recently said is equally applicable here. "The right of free speech guaranteed by the First Amendment and by § 8(c) should not be defeated by narrow or strained construction." N. L. R. B. v. William J. Burns Int'l. Detective Agency, Inc., 346 F.2d 897, 903 (8th Cir. 1965).

 The interrogations revealed personal expressions of surprise, curiosity, disappointment and antiunion animus, but the record is void of evidence that even those innocuous statements by McCollom were coercive and injurious to the employees' right of self-organization. N. L. R. B. v. D. Gottlieb & Co., 208 F.2d 682 (7th Cir. 1953).

## § 8(a) (3)—Layoff

To understand the layoff of eight employees found by the examiner to be in violation of § 8(a) (3), it is necessary to at least summarize the operational background of Howard.

In periods of normal business activity, Howard runs only one shift as the operation of a night shift is more expensive to the extent of four or five cents per ton of crushed stone. Operations at the Sweet Springs Quarry were begun in the fall of 1963 with one shift and a small crusher producing second grade stone and lime for routine road maintenance obligations to the state and to stockpile for open market sales. In October, 1963, Howard obtained a contract for prime crushed rock fill needed on part of Interstate Highway No. 35 which was being constructed by Howard Construction Company, an affiliate concern. The contract required completion in one hundred ninety working days. Under an original schedule, the spreading of crushed rock was to begin August, 1964 after the Construction Company had completed grading and other dirt work. Preliminary crushing was to begin at a second pit, the Cameron Quarry, the middle of July, 1964. In the spring of 1964, however, Howard procured an additional contract to furnish rock to Manefree Construction Company with delivery by August 1, 1964.

The Sweet Springs Quarry being unable to meet both production schedules with a single shift and one small crusher, a large crusher was moved in, and, after expanding the day shift, a second shift of twelve men was added about April 20 with the idea of quickly satisfying the Manefree requirements and then moving the large crusher to the Cameron Quarry to produce the highway stone.

Because of spring rains complicating the highway grading, Howard's work schedule was changed so that its only immediate deadline was the Manefree stone which could be produced with one

shift at Sweet Springs before moving to the Cameron Quarry. Additionally, the night shift at Sweet Springs had crushed and stockpiled all rock stripped by the day shift and had no rock on hand to process. Consequently, on May 6 the entire night shift was laid off for the remainder of the week, although some night employees were transferred to the day shift to help with stripping. The lawfulness of this layoff is not challenged by general counsel.

On Sunday, May 10, President Marvin Howard, Vice President Olin Howard, and Superintendent McCollom again met to review production schedules and concluded that the Manefree job could be completed on time with an expanded day shift. It was decided to discontinue the night shift within a week or ten days, and add the best men therefrom to the day shift. Completing production too soon would mean a larger layoff and involve some of the best workers who might obtain employment elsewhere and not be available to Howard in the future. Responsibility for determining which men would be laid off was left to McCollom, day foreman Lloyd Davis, and night foreman Vern Garrison.

At the end of the week, May 15, this prescheduled termination of the night shift was effectuated. Those employees selected for layoff were notified on Saturday and Sunday by McCollom, Davis and Garrison, who, in answer to inquiries, explained the layoff as "a cutback" necessitated by production schedule changes and operational cost of the extra shift. The men were advised that union interest had not been a consideration in layoff selections and that Howard would call them back to work in about three weeks.

It was well understood that the layoff was temporary and that Howard's policy was to keep the best men at all times.[6] Seniority was not and never had been a basis in selection of employees for layoff.[7]

The Board found the layoff economically motivated but based the § 8(a) (3) violation on the discriminatory selection of employees to be laid off by failure to follow its usual policy of retaining the best men.[8] The finding of discriminatory selection in employees for layoff is not based upon evidence offered by general counsel but is founded upon Howard's failure to produce records evidencing qualifications of those men retained and those laid off. The examiner thought such absence of specific qualifications "weakened [Howard's] defense" and warranted the inference that such proof, if adduced, would not support Howard's position. Consequently, the record proof which "afford[ed] the only clue as to their work ability" was strained until the meager facts provided superficial justification for the § 8(a) (3) violation. Relative wages, length of employment, and the different jobs performed during service were, in the cases of layoffs, offered as outstanding qualifications of superior employees while in-

---

6. Employee James Mullins was laid off but was asked by McCollom to apply for work at Howard Construction. Mullins declined because he was not interested.

7. The examiner found Howard "consistent with its practice of laying off men solely on the basis of qualifications, without regard to seniority, * * * [and therefore] no discriminatory significance in the bare fact that [Howard] retained three employees of comparatively short service while temporarily terminating six men of longer tenure."

8. Despite Howard's decision of May 10 to make the layoff within a week or ten days, the examiner attempted to weaken the economic motivation by pointing out (1) the actual decision was issued on May 15 or the day the union finally achieved fifteen of twenty-nine employees, and (2) an unfounded recapitulation of questionable facts and figures demonstrating that Howard possibly saved very little by operating only one shift. This latter reason was discounted by the Board. As for the fact that the union obtained a majority on May 15, we are unable to see any importance or attribute any knowledge of this fact to Howard in that Mr. Eugene Bennett, a teamster representative, testified that while a majority was reached by May 15, recognition was not demanded until the following week.

distinquishable qualifications of a retained employee only evidenced Howard's prejudice and discrimination.

We think the examiner erred in his conception of upon whom the burden of proof falls in establishing a violation of the Act. He speaks of "widespread" and "deliberate" interrogations and an "implied" threat of reprisal made to one employee, all of which reflect respondent's awareness of the organizational campaign before the layoffs. These were found to present a prima facie case of discriminatory layoffs "which required respondent to go forward with proof adequate to rebut it." Additionally, the examiner points out other evidence as not weakening "the prima facie case sufficiently to relieve respondent of the burden of going forward with proof in rebuttal." He concludes "after careful consideration of all the pertinent evidence, and arguments of counsel, pro and con, * * * that respondent has failed to sustain the burden of adducing proof adequate to rebut the prima facie case of discriminatory layoff. * * *"

 Contrary to the examiner's notion, it is elementary and settled law that the burden of proof to support a charge of violation is upon the Board— and the burden never shifts to the employer to prove his innocence.[9]

In N.L.R.B. v. Great Atlantic & Pacific Tea Co., 346 F.2d 936, 939 (5th Cir. 1965), the court stated, "When the General Counsel charges that an employer has committed an unfair labor practice, he must produce substantial evidence from which it may be inferred that a violation of the Act took place." And, the Seventh Circuit held in N.L.R.B. v. Chicago Perforating Co., 346 F.2d 233, 238 (7th Cir. 1965), "The burden was upon the Board to prove that his dis-

charge was because of his union activities."

 Neither is the burden upon an employer to show that a retained employee is more valuable or efficient in his occupational unit than one laid off. Rather, the burden is upon the Board. Interlake Iron Corp. v. N.L.R.B., 131 F.2d 129, 134 (7th Cir. 1942). And in the instant case, there was not even the production of evidence by the general counsel to show that a single retained employee was less efficient or valuable than the ones laid off. The crucial question is not knowledge on Howard's part of the organizational activities, or even any union animus, but rather whether the employees temporarily laid off were selected in a discriminatory fashion. Postulation based on antiunion animus or statistics do not serve as substitutes for substantial evidence to support the serious charge of § 8(a) (3) layoffs. Neither can a violation be grounded upon an unwarranted and illegal shifting of the burden of proof. The unchallenged testimony on the part of Howard's witnesses was that the layoffs, as always under company policy, were based upon qualifications and personal desires of the employees. We can only assume that the company considered all of the employees as good workers. Also, we are dealing with a background of fifteen years' involvement with picketing and attempts to organize without the slightest suggestion of any prior inimical feeling by Howard towards the union. Our canvass of the record as a whole leaves us with the clear impression that there is a total lack of substantial evidence in support of the § 8(a) (3) charge.

The order of the Board is set aside and its application for enforcement is denied.

9. In addition to the cases cited in the opinion, see N.L.R.B. v. Soft Water Laundry, Inc., 346 F.2d 930 (5th Cir. 1965) and N.L.R.B. v. Winter Garden Citrus Prod. Coop., 260 F.2d 913 (5th Cir. 1958) and cases there cited.