**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FRONTIER HOMES CORPORATION, Respondent.**

No. 18459.

United States Court of Appeals
Eighth Circuit.

Feb. 6, 1967.

Rehearing Denied March 2, 1967.

Hans J. Lehmann, Atty., N. L. R. B., Washington, D. C., for petitioner, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and George B. Driesen, Atty., N. L. R. B., Washington, D. C., were with him on the brief.

Frederick S. Cassman, Omaha, Neb., for respondent, Abrahams, Kaslow & Cassman, Omaha, Neb., were with him on the brief.

Before VAN OOSTERHOUT, GIBSON and HEANEY, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

The petitioner, National Labor Relations Board, seeks, pursuant to § 10(e) of the National Labor Relations Act, as amended, (29 U.S.C. § 151 et seq.) enforcement of its decision and order against respondent, dated July 1, 1965 and reported at 153 NLRB No. 39. Respondent, Frontier Homes Corporation, (Frontier) is engaged in the manufacture of house trailers at Falls City, Nebraska. The decision and order of the Board found that Frontier had violated the Act by making threats of reprisal for Union support, by refusing to furnish the Union with its selling price lists on trailers, and by unilaterally changing its layoff practices.

Frontier was organized in 1952, and in January, 1957 opened its plant at Falls City, Nebraska. In November of that same year, the United Steelworkers of America (Union) was certified as the exclusive representative of the Company's approximately 150 production and maintenance employees.

The collective bargaining agreement with which we are concerned expired on December 31, 1963. Prior to the expiration date, both parties gave the required notice of intention to amend the terms of the contract. Negotiating sessions were started in December, 1963, nine sessions being held that month, and ran through April, 1964. Certain activities of the Company during these negotiating sessions prompted the unfair labor practice complaints of the Union. In partially affirming the Trial Examiner, a majority of the Board[1] found Frontier guilty of three distinct unfair labor practices.

I.

At the bargaining session held December 26, 1963, Plant Manager Davidson related a story about his former employer, the Ohio Match Company, and that Company's Lumber Division. Davidson testified about this matter, as follows:

" * * * I told them how the lumber division had a background of labor trouble, a six months' strike. It was quite a different contrast to what we had experienced at Ohio Match where we had a mature relationship and where we used to negotiate a contract in three or four days, but at Idaho, where I wasn't working or had any contact, I had understood that they had sold the Company to a competitor and the plant was shut down for a little better than 30 days, and following the shutdown, the plant was reopened by the competitor, and it was my understanding that they hired in employees who were less obstreperous, was the information I had on it.

"This discussion was in a context, and the context was the desirability of Frontier at Falls City to try to develop

---

1. Chairman McCulloch of the Board dissented from that part of the Decision and Order finding the unilateral layoffs violative of the Act, and the finding of a § 8(a) (1) violation in making reprisal threats.

the same type of mature relationship we had at Ohio Match, as opposed to some of these other instances that had been occurring in other industries in other plants, the need for us to try to get together and work in harmony."

At the bargaining session held January 11, 1964, Davidson was heard to remark, "Gosh, if we had this thing settled the first of the year, we wouldn't have this trouble now."

The Board majority concluded from this testimony that the story and the remark carried the "aroma of coercion" and interfered with the employees' rights under the National Labor Relations Act in violation of § 8(a) (1). They argue here that there is substantial evidence to support this conclusion. We cannot agree.

Section 8(a) (1) of the Act (29 U.S.C. § 158) provides:

"(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by Section 157 of this title * * *."

(Section 157 relates to the rights of organizing and collective bargaining.)

■■ To determine if a statement by a company representative coerces employees in violation of their rights to assist labor organizations and bargain collectively through representatives of their own choosing as guaranteed by this section, the remark must be viewed in the context in which it was delivered. To begin, we agree with the dissent of Board Chairman McCulloch that the finding of a "veiled threat" in Davidson's story required a strained interpretation of the remarks. Even so, had these remarks been directed at a group of employees during a unionization campaign, perhaps a fact finding body might have justifiably found them to be coercive. The cases cited by the Board dealt with the organizational phase of the collective process and are not considered in point on the give and take of collective bargain-

ing sessions. These remarks were not made to the unsophisticated employee, but during negotiation sessions in the presence of professional negotiators from the United Steelworkers Union. It is highly unlikely that these seasoned men would be impressed, much less coerced by Davidson's bland recital. The Board should have recognized that which might coerce the average worker may have little, if any effect on the Union's team of experienced negotiators during the process of hammering out a collective bargaining agreement.

Another factor in the total context of this picture is the history of the past relations between the parties. When the parties have had a history of good relations, an ambiguous statement by the employer will not have the impact that the same statement would have on employees who have been the victims of past coercion and unfair conduct. In the case before us, the Union and the employer have been dealing amicably with one another for a number of years. With such a history of good relations, a single ambiguous story during contract negotiations is not enough to have any significant coercive effect on the representatives of the employees.

■ Furthermore, there were a total of twenty-four bargaining sessions. Fifteen of these sessions followed the allegedly coercive story. With this many hours of meeting and negotiation, there are bound to be some ambiguous or borderline statements. We believe it is a mistake for the Board to pounce upon a single statement, give it microscopic examination in total isolation from the surrounding circumstances, stretch it to the most coercive connotation possible, inflate its relative importance to the negotiations well beyond any impact it could have had upon the parties, and conclude that it, standing alone, was violative of the employees' rights. Statements made during negotiation sessions must be viewed, not only with a certain liberality, but with an eye to their total impact upon the negotiations. From the innocuous nature of the statement, the parties

involved, the number of meetings, and the history of the past relations, we do not believe this story and statement had a coercive effect upon the employee representatives. Indeed, we believe the "aroma of coercion" to be so faint that it cannot alone support the Board's finding of a § 8(a) (1) violation. Enforcement of this section of the Board's decision and order is denied.

## II.

Since 1960, the Company had in effect a Productivity Sharing Plan. The plan is a part of the overall wage structure that provides a bonus for employee efficiency. The basic mechanics of the plan are simple. A labor cost allowance is set by the Company on each type of mobile home manufactured. At the end of the week, the allowances for all the completed mobile homes are totaled. The total weekly payroll is then subtracted from the total of allowances. The difference between the Company's allowance and the actual labor cost is an allowable bonus that is divided equally among the employees on a per hour basis. When asked by a Union representative how the basic allowance was determined, the Company Vice President responded that the labor allowance rates were set at approximately 10% to 10½% of the selling price of the units to the dealers.

At the first bargaining session, held December 2, 1963, the Union requested a breakdown, showing how the bonus was determined. The request was repeated on December 27, 1963. During the February 10, 1964, negotiation session, the Union was told there would be no wage increases and that any increase in earnings would have to come from the operation of the bonus plan. At the April 6, 1964 meeting, the Union specifically asked for the selling price lists so that the Union Negotiation Committee could compute the bonus. The Company responded that the lists were not for the public and would not be supplied. An unfair labor practice charge resulted from the refusal. The Trial Examiner found that the failure to furnish information was a refusal to bargain in good faith as re-

quired by § 8(a) (5) of the Act. This finding was affirmed by the Board. Section 8(a) (5) of the Act, (29 U.S.C.A. § 158(a) (5)) provides:

"(a) It shall be an unfair labor practice for an employer—

(5) to refuse to bargain collectively with the representatives of his employees * * *."

█ It has been repeatedly held that employee representatives are entitled to wage information and related data in order to effectively negotiate over the rate of compensation. Timken Roller Bearing Company v. NLRB, 325 F.2d 746, 750, 2 A.L.R.3d 868 (6 Cir. 1963); NLRB v. Yawman & Erbe Mfg. Co., 187 F.2d 947 (2 Cir. 1951); NLRB v. Fitzgerald Mills Corporation, 313 F.2d 260, 265 (2 Cir. 1963), cert. denied 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64.

This bonus plan was a topic of discussion from the earliest negotiation sessions. Later in the sessions, the Company indicated that any increase in compensation must come from this bonus plan and not from the regular wages. The bonus had been a part of the Company's overall compensation plan for a number of years and had even been incorporated in the 1963 collective bargaining agreement. Through these years the bonus was paid on a weekly basis to all employees of the unit, along with their regular wages. The facts prompt us to agree with the Trial Examiner that the bonus plan was indeed an integral part of the Company's wage structure, and as such was equivalent to wages for collective bargaining purposes.

██ The requested data was highly relevant and material in determining the actual compensation and in evaluating possible increase in future compensation. Frontier had incorporated its selling prices of its trailers into its overall compensation scheme, so that these prices had become a vital ingredient that must be disclosed to the Union. This relevant information can no longer remain confidential under these circumstances, for without it the Union is forced to use an

equation with an unknown quantity in trying to evaluate the total compensation of its members. Refusal of an employer to supply relevant wage information and data constitutes a refusal to bargain in good faith and this violates § 8(a) (5) and (d) of the Act (29 U.S.C. § 158(a) (5) and (d)). Timken Roller Bearing Company v. NLRB, supra.

 Even though the employer considers this information confidential, if it involves the relevant issue of compensation it may not be kept from the employee representative. Curtiss-Wright Corporation, etc. v. NLRB, 347 F.2d 61, 71 (3 Cir. 1965); Boston Herald-Traveler Corporation v. NLRB, 223 F.2d 58 (1 Cir. 1955); Aluminum Ore Company v. NLRB, 131 F.2d 485, 487, 147 A.L.R. 1 (7 Cir. 1942). On this issue, the Board's order is entitled to enforcement and is ordered enforced.

### III.

Respondent's manufacture of house trailers fluctuated with the season. This seasonal fluctuation necessitated periodic layoff of employees. It had been the established practice of the Company to lay off employees strictly on the basis of seniority, even though the collective bargaining agreement between the Company and the Union appears to authorize consideration of the employees' abilities. The contract provided, in part:

> "The company shall observe seniority principles and in all cases of layoff, * * * *ability being substantially equal,* seniority shall prevail * * *."

(Emphasis supplied.)

By its own terms, this contract expired on December 31, 1963. On January 3, 1964, it was discovered that the economic situation necessitated a layoff of 25 men. Plant Manager Davidson instructed the foremen to rate the ability of each workman on the basis of a recently introduced employee rating system and select the 25 employees with the poorest ratings for layoff. The Union was not notified or consulted. On January

4th, four days after the expiration of the contract, while negotiations were in process on a new contract, 25 employees were laid off.[2] Of these 25, 19 would not have been included in the layoff had strict seniority been followed. Though there was no charge that the selection of the employees for layoff was discriminatory, the Trial Examiner found this unilateral action of the Company to be a refusal to bargain in good faith as required by § 8(a) (5) of the Act (29 U.S.C. § 158) and pursuant to § 10(c) of the Act (29 U.S.C. § 160) ordered "back pay" to make the 19 employees whole. The decision of the Trial Examiner on this issue was upheld by a split decision of the Board.

 The law obligates an employer to negotiate with the representatives of his employees over certain subjects. These mandatory subjects for bargaining are "wages, hours, and other terms and conditions of employment". 29 U.S.C. § 158(d). The refusal of a party to negotiate over a topic which falls into one of these broadly defined categories violates the Act's requirement of good faith collective bargaining. Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); NLRB v. J. H. Allison & Co., 165 F.2d 766, 3 A.L.R.2d 990 (6 Cir. 1948), cert. denied 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369. Furthermore, the law prohibits the employer from altering any of the mandatory subjects of bargaining without first contacting the bargaining representative and granting the opportunity to negotiate the change. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); NLRB v. Proof Company, 242 F.2d 560 (7 Cir. 1957), cert. denied 355 U.S. 831, 78 S.Ct. 45, 2 L.Ed.2d 43. A unilateral altering of a condition of employment is thus legally tantamount to a refusal to bargain.

 Seniority rights and layoff practices have been recognized by the courts as falling within the broad defini-

**2.** The laid-off employees were recalled to work, one or two at a time, commencing the following week, until the last employee was recalled, about March 1, 1964.

tion of "terms and conditions of employment." NLRB v. Exchange Parts Company, 339 F.2d 829 (5 Cir. 1965); Industrial Union of Marine & Shipbuilding Workers of America, AFL–CIO v. NLRB, 320 F.2d 615, 620 (3 Cir. 1963), cert. denied Bethlehem Steel Co. v. NLRB, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472; NLRB v. Proof Company, supra. Therefore, the employer would be obligated to negotiate over any proposals relating thereto. It follows as a matter of course that an employer may not unilaterally alter the existing seniority of layoff practices and remain immune from an unfair labor practice charge.

■ Frontier is in a seasonal industry that regularly laid off a substantial number of workers. The past practice had been to lay off workers strictly on a basis of their seniority. Frontier probably would have been justified in following its long-established practice of seniority layoff without consulting the Union, as "a mere continuation of the status quo * * *." NLRB v. Katz, supra, at page 746 of 369 U.S., at page 1113 of 82 S.Ct.; Rockwell Register Corporation, 142 NLRB 634. However, since seniority and layoff practices are subjects for mandatory bargaining, the employer is not free to make changes at will. Any change in the established practices requires that the employer notify the bargaining representative and submit the proposed change to negotiation. The unilateral alteration of this established condition of employment is a proscribed refusal to bargain under the Act. Industrial Union of Marine & Shipbuilding Workers of America, AFL-CIO v. NLRB, supra.

■ This conclusion cannot be altered by the fact there was an expired contract provision that might have authorized the action of Frontier. Had the contract been in force at the time of the layoff, Frontier would have been justified in following its terms even though it differed from the past practice. The right to consider ability (to some extent) had already been given as the result of past negotiations, so to the extent granted

there would have been no need to submit this issue to further negotiation. However, the fruit of these past negotiations must end with the expiration of the contract. As of the end of December 31st, the contract legally ceased to exist. Industrial Union of Marine & Shipbuilding Workers of America, AFL–CIO v. NLRB, supra, at pages 619–620, of 320 F.2d. There is nothing in the Act or in the case law interpreting the Act, that authorizes the terms of the contract to extend beyond its expiration date. Proctor & Gamble Independent Union of Port Ivory, N. Y. v. Proctor & Gamble Manufacturing Company, 312 F.2d 181 (2 Cir. 1962), cert. denied 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053; Food Handlers Local No. 425, etc. v. Arkansas Poultry Co-Op, Inc., 199 F.Supp. 895 (W.D.Ark. 1961); In re Eisen, 191 Misc. 662, 77 N.Y.S.2d 676, 14 L.C. § 64,369 (1948). Consequently, there is no reason why this expired contract should serve to relieve the employer of his statutory duty to negotiate with the Union over a change in seniority and layoff procedures. This being true, there is no reason why the expired contract should authorize a unilateral changing of this mandatory subject of collective bargaining.

■ The expiration of the contract would permit the Company to negotiate for a new and different layoff arrangement, but would not allow it to institute a unilateral change on this mandatory bargaining issue without negotiating. The entire operation of the Company, including precedent, custom, tradition and contract, must be viewed in establishing the industrial pattern of its operation. Any changes affecting matters of mandatory bargaining, "wages * * * and other terms and conditions of employment," which include layoffs, must be negotiated out, or at least until an impasse is reached. An expired contract in the Labor-Management field must be viewed in light of its effect upon the past operation of the plant and the entire industrial pattern which has been established, in part, by it, together with the customs, practices,

and traditions of the industry and the Company. Expired contract rights affecting mandatory bargaining issues, therefore, have no efficacy unless the rights have become a part of the established operational pattern and thus become a part of the *status quo* of the entire plant operation.

It is our conclusion that notwithstanding the expired contract, which apparently authorized layoff on the basis of ability, the Company, by unilaterally altering its well established employment practices, violated § 8(a) (5) of the Act by refusing to bargain in good faith. The Board's finding in this regard is correct.

Respondent Company argues that the back pay award to the 19 employees who would not have been laid off if past practices had been followed, is penal in nature and should not be enforced. In view of the Supreme Court's recent pronouncement in Fibreboard Paper Products Corporation v. NLRB, 379 U.S. 203, 85 S.Ct. 398 (1964) respondent's argument has no basis. In *Fibreboard*, employees were discharged and the Company refused to negotiate its actions in replacing them with "independent contractors." In holding that this was a refusal to bargain as required by the Act, the Court upheld back pay awards for the employees, saying:

> "That section [10(c)] 'charges the Board with the task of devising remedies to effectuate the policies of the Act.' [National] Labor [Relations] Board v. Seven-Up Bottling Co., 344 U.S. 344, 346, [73 S.Ct. 287, 289, 97 L. Ed. 377]. The Board's power is a broad discretionary one, subject to limited judicial review. Ibid. '[T]he relation of remedy to policy is peculiarly a matter for administrative competence * * *.' Phelps Dodge Corp. v. [National] Labor [Relations] Board, 313 U.S. 177, 194, [61 S.Ct. 845, 852, 85 L.Ed. 1271]. * * * The Board's order will not be disturbed 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' Vir-

ginia Electric & Power Co. v. [National] Labor [Relations] Board, 319 U.S. 533, 540 [63 S.Ct. 1214, 1218, 87 L.Ed. 1568]."

The Company was guilty of an unfair labor practice in changing employment practices without consulting the representatives of these workers. In light of the above decision, we believe the Board was within its discretionary authority to grant back pay awards to the 19 employees who were victims of this unilateral change in practice. The back pay order is entitled to enforcement.

Enforcement of the Board's order finding coercive threats by Plant Manager Davidson is denied. The Board's order relative to furnishing price list of units and making whole the 19 employees laid off on basis other than seniority, is ordered enforced.