**DIERKS FORESTS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 18713.**

United States Court of Appeals
Eighth Circuit.

Nov. 16, 1967.

Landon H. Rowland, of Watson, Ess, Marshall & Enggas, Kansas City, Mo., for petitioner; Carl E. Enggas and Charles K. Thompson, Kansas City, Mo., and Elbert Cook, DeQueen, Ark., were with Landon H. Rowland, Kansas City, Mo., on the brief.

William J. Avrutis, Atty., N.L.R.B., for respondent; Arnold Ordman, Gen. Counsel, Dominick .L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Elliott Moore, Atty., N.L.R.B., were with William J. Avrutis, Washington, D. C., on the brief.

Before VAN OOSTERHOUT and MATTHES, Circuit Judges, and HARPER, District Judge.

MATTHES, Circuit Judge.

This case is before the Court on the petition of Dierks Forests, Inc. to review and set aside, and on the cross petition of the National Labor Relations Board to enforce, an order issued against Petitioner on July 20, 1966, pursuant to Section 10(c) of the National Labor Relations Act. The Board's decision and order are reported at 160 N.L.R.B. No. 18. No jurisdictional problems are presented. We grant Dierks' petition to set aside the order of the Board and deny the Board's cross petition for enforcement.

The unfair labor practice charge in the present case had its genesis in the organizational efforts of the United Paper Makers and Paper Workers, AFL-CIO (Union) to secure representation of Petitioner's employees at its fiberboard plant located at Craig, Oklahoma, sometimes referred to as the Broken Bow Plant.[1]

1. Petitioner and its subsidiaries produce lumber and paper products in a number of mills and plants throughout Arkansas and Oklahoma.

Pursuant to a stipulation for certification upon a consent election to be held under Board supervision, an election was conducted among Petitioner's production and maintenance employees on November 3, 1965. Out of approximately 167 eligible voters, sixty-five voted in favor of the Union while ninety-one voted against the Union.

On November 8, 1965 the Union filed timely objections to pre-election conduct on the part of the Petitioner allegedly affecting the results of the election. After investigation the regional director recommended in his report filed on January 27, 1966 that all but two of Petitioner's objections be overruled and that a hearing be directed with respect to these two objections in consolidation with proceedings emanating from an unfair labor practice charge filed against Petitioner on November 17, 1965.[2]

The unfair labor practice charge alleged that Petitioner (a) had discharged one of its employees because of his membership and activities in behalf of the Union, in violation of Section 8(a) (3) of the Act; (b) had interfered with, restrained and coerced its employees in the exercise of their rights guaranteed under Section 7 of the Act, in violation of Section 8(a) (1). The Board declined to entertain the Section 8(a) (3) charge, but issued a complaint on January 27, 1966 alleging that Petitioner had violated Section 8(a) (1) by coercively interrogating and threatening its employees on various occasions between September 21, 1965 and October 29, 1965. Following the hearing on the consolidated proceedings the Board adopted the report and recommendations of the Trial Examiner, and found that Petitioner had violated Section 8(a) (1) through coercive interrogations of its employees, and that such conduct interfered with their exercise of a free and untrammeled choice in the election. The Board issued a cease and desist order, set aside the election held on November 3, 1965 and ordered another election to be conducted under the supervision of the regional director.

This labor case is typical of many others in that the unfair labor practice charge and related objections to the election emanate from an organizational campaign sponsored by the Union to gain the support of the employees. During the campaign most of Petitioner's employees discussed the respective advantages and disadvantages of Union representation. Petitioner, through its operating personnel, attempted within permissive limits to counter Union propaganda. In opposition to the campaign staged by the Union adherents, thirty-four employees had signed and sent to Petitioner's other employees a letter setting forth in detail their reasons for opposing representation by the Union. The inference is clear that the organizational campaign permeated the entire plant. Viewing the record as a whole, however, we find no substantial evidence of impropriety or unlawful conduct on the part of the Petitioner. Indeed the regional director's dismissal of the majority of the post-election objections filed by the Union would seem to refute the allegation of high-pressure campaign tactics on the part of the Petitioner.

The evidence offered by the general counsel consisted of the testimony of six employees, one of whom was thoroughly discredited. The testimony of two other employees was so irrelevant and innocuous that the Trial Examiner gave it no consideration.

The Trial Examiner predicated his decision on the testimony of three employees, Jimmy O'Donnell, Edward Leonard and James Mills. On the basis of their testimony the Examiner concluded that there was sufficient evidence to warrant a finding that Petitioner, through its Superintendent of Production, Tom Coulter, had engaged in coercive interrogation and had made

---

2. In summary, the Union's two remaining objections were directed at Petitioner's interrogation of its employees and surveillance of their union activities.

threats of reprisal in violation of Section 8(a) (1).

We disagree. In our view Petitioner's allegedly coercive statements, when viewed on the record as a whole, are of too isolated and casual a nature to constitute an unlawful course of action in violation of Section 8(a) (1). James P. Mills, a former employee of Petitioner, testified that he had two conversations with Coulter. During the first, according to Mills' version, Coulter asked him if a Union man had been to see him. Mills answered yes, and then Coulter asked, "James, what have they promised you this year?" Mills' response was noncommittal. During the next interview Coulter stated to Mills that he had heard from two or three employees that Mills was for the Union. Mills' response was "no sir, I was not." We do not believe it is necessary to engage in any extended discussion in order to demonstrate that the dialogue between Coulter and Mills is of insufficient gravity to support an inference that Mills was threatened or coerced in the exercise of his rights under Section 7 of the Act.

Coulter's confrontation with Leonard is equally harmless. According to Leonard Coulter stated "that he had heard that * * * [Leonard] had gone bad on him," and that "* * * [Leonard] was for the Union." Leonard's response was that he could concentrate all the dealings that he had with the Union on the point of his knife, and that he would make his own independent determination on whether to vote for or against the Union. During the ensuing conversation Coulter commented that employees Phil Jones and George Whitten were "on this in-plant organization committee [and] would probably run the thing." He stated that "Phil would probably present him with the contract," and if he did, Coulter "would tell him to kiss his * * *."

Coulter denied that he inquired how Leonard felt about the Union, but admitted that he jokingly uttered the above vulgarity concerning Phil Jones. Even if Coulter's remarks were made in a serious vein and were not the "common sort of banter encountered in any plant," as suggested by Petitioner, it would indeed require a vivid imagination to interpret his remarks as containing an implied threat or attempt to coerce Leonard from exercising a free and uninhibited choice in the election.

The only evidence lending any semblance of support to the Board's order is found in the testimony of employee, Jimmy O'Donnell. During a conversation with O'Donnell on October 25th, Coulter stated that he had checked some old records in the office, and had ascertained that O'Donnell had been for the Union. O'Donnell categorically denied any affiliation or allegiance to the Union. Coulter then stated that "they would shut the Craig Plant down if we voted the Union in, because all of the owners had a million dollars or more in their pockets." O'Donnell further testified that Coulter confirmed that "Dierks had plan[s] to expand the Craig Plant, but they wouldn't if we worked against them and worked the Union in." Coulter denied the statements attributed to him by O'Donnell, but the Trial Examiner chose to credit O'Donnell's testimony.

We have held on prior occasions that it is an unfair labor practice for a Company to threaten its employees with moving or shutting down the plant, and consequent loss of employment as the result of their support for the Union. N.L.R.B. v. Louisiana Manufacturing Company, 374 F.2d 696, 702 (8th Cir. 1967); N.L.R.B. v. Byrds Manufacturing Corporation, 324 F.2d 329, 332 (8th Cir. 1963); Marshfield Steel Company v. N.L.R.B., 324 F.2d 333, 336 (8th Cir. 1963). Where, however, as here, the offensive statement is isolated and not part of any systematic pattern of intimidation, there must be other circumstances fairly representative of the Company's anti-union attitude in order to support a finding of economic reprisal in violation of Section 8(a) (1). Elastic Stop Nut Corporation v. N.L.R.B., 142 F.2d 371, 377 (8th Cir. 1944), cert denied, 323 U.S. 722, 65 S.Ct. 55, 89 L.Ed. 580

(1944). See also National Can Corporation v. N.L.R.B., 374 F.2d 796, 806–807 (7th Cir. 1967); N.L.R.B. v. Frontier Homes Corporation, 371 F.2d 974, 977–978 (8th Cir. 1967).

We have similarly refused to grant enforcement of the Board's order in Section 8(a) (1) situations involving interference, threats and coercion where the Board's case rested on a single or isolated statement. N.L.R.B. v. Frontier Homes Corporation, supra at 977; N.L.R.B. v. Howard Quarries, Inc., 362 F.2d 236, 239–240 (8th Cir. 1966); N.L.R.B. v. Blades Manufacturing Corporation, 344 F.2d 998, 1003–1004 (8th Cir. 1965); N.L.R.B. v. Johnnie's Poultry Company, 344 F.2d 617, 619 (8th Cir. 1965); N.L.R.B. v. Council Manufacturing Corporation, 334 F.2d 161, 165 (8th Cir. 1964); Beaver Valley Canning Company v. N.L.R.B., 332 F.2d 429, 433 (8th Cir. 1964). This principle has been applied by other Courts. See, e. g., Firestone Synthetic Fibers Company v. N.L.R.B., 374 F.2d 211, 214–215 (4th Cir. 1967).

We have carefully canvassed the entire record in light of our responsibility as enunciated in Universal Camera Corporation v. N.L.R.B., 340 U.S. 474, 490–491, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and cannot escape the conclusion that the Board has utterly failed to carry the burden of proving that Petitioner has violated Section 8(a) (1) by means of threats and coercive interrogation. See N.L.R.B. v. Howard Quarries, Inc., supra, 362 F.2d at 242; N.L.R.B. v. Southern Transport, Inc., 343 F.2d 558, 560 (8th Cir. 1965), holding that the burden is on the general counsel to present a sufficent evidentiary basis in support of the unfair labor practice charge.

A scintilla of evidence is not sufficient. There must be substantial evidence on the record as a whole to support the Board's findings. Universal Camera Corporation v. N.L.R.B., supra.

All we have here in the nature of threats and proscribed interrogation is an isolated statement conveyed to a single employee. It is indeed significant that out of 167 eligible voters at the Craig Plant the general counsel elicited the testimony of only six employees in support of the complaint, and only one of these (O'Donnell), whose testimony was controverted, furnishes any semblance of support for the Board's findings.

Another circumstance should be noted. Petitioner asserts in its brief, and the Board does not deny, that for a number of years it has bargained amicably with various unions at other plants and has negotiated between ninety and one hundred labor contracts.[3] As we appropriately observed in N.L.R.B. v. Frontier Homes Corporation, supra:

"When the parties have had a history of good relations, an ambiguous statement by the employer will not have the impact that the same statement would have on employees who have been the victims of past coercion and unfair conduct." 371 F.2d at 977.

See also Bourne v. N.L.R.B., 332 F.2d 47, 48 (2d Cir. 1964). Apart from the permissive pre-election campaign conduct pursued by the Petitioner, there is absolutely no evidence of any anti-union animus on its part, and no circumstances indicative of an unlawful course of conduct calculated to disrupt its employees' freedom of choice.

In summary we hold the Board's order is not supported by substantial evidence. Judge Blackmun's observation in N.L.R.B. v. Council Manufacturing Corporation, supra, is apropos here:

"The Board's conclusion as to this issue [interference and restraint] rests on the single statement attributed by Lott to Plant Manager Corbell to the effect that Mr. Council would close down the plant or automate it 'before we have a union here', and on

---

3. Petitioner asserts that with one exception it has never been charged with a failure to bargain in good faith. The exception is found in Dierks Forests, Inc., 148 N.L.R.B. No. 92 (1964).

the fact that this statement was uttered, if at all, after Lott's September contact with Gilmore.

"We regard this disputed testimony, despite its creditation by the trial examiner and by the Board, and despite its characterization in the Board's brief as 'an obvious violation', as too thin a crust on which to rest anything as serious as a § 8(a) (1) violation. We have the impression that the Board of late has tended to overstretch on this type of issue and that, in the light of *Universal Camera*, a foundation of much greater substance is required than the isolated statement present here. We have refused enforcement in similar situations, particularly on interrogation, in recent cases." 334 F.2d at 165.

The petition to set aside the Board's order is granted and, the Board's cross petition for enforcement is denied.