**ACME PRODUCTS, INC.,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 18863.

United States Court of Appeals Eighth Circuit.

Feb. 13, 1968.

Jack L. Whitacre, of Spencer, Fane, Britt & Browne, Kansas City, Mo., for petitioner; Harry L. Browne, Kansas City, Mo., on the brief.

Corinna Lothar Metcalf, Atty., N. L. R. B., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Lawrence M. Joseph, Atty., N. L. R. B., on the brief.

Before VAN OOSTERHOUT and MATTHES, Circuit Judges, and HARRIS, District Judge.

VAN OOSTERHOUT, Circuit Judge.

This case is before us upon petition of Acme Products, Inc., (Acme), to review the order of the National Labor Relations Board issued May 9, 1967. The Board has filed an answer and a cross-petition seeking enforcement of its order. The Trial Examiner's decision recommending the dismissal of all charges and the two-to-one Board panel decision upholding the violations charged and the Board's order are all reported at 164 NLRB No. 62. Jurisdiction of this court under § 10(e) and (f) of the National Labor Relations Act as amended, 29 U.S.C.A. § 151 et seq., is established.

The Board majority found Acme had violated the Act in the following respects:

(1) Section 8(a) (3) and (1) by discharging six employees (Ross, Smith, Rice, O'Dell, Stone and Goodman), for union sympathies and activities.

(2) Section 8(a) (1) by coercively interrogating employees as to union activities and sympathies.

(3) Section 8(a) (5) and (1) by unlawfully refusing to bargain with the union (District Lodge No. 71, International Association of Machinists and Aerospace Workers, AFL–CIO).

Acme is engaged in the manufacture of trailer hitches at its two plants in Kansas City, Missouri, located about one and one-half miles apart. The hitches are manufactured at Plant No. 1. The assembly, packing and shipping of the completed units is done at Plant No. 2. Total employment of hourly workers fluctuated between eight employees in the slack season to twenty-four employees in the peak season which runs from about February to August. The events upon which the charges here involved are based occurred in January and February 1966. During that period the company employed about fourteen hourly paid employees and was about to expand its work force for the peak season. William Kreiling, president of the company, kept in close touch with the plant operations at both plants. His testimony, which in some respects was in conflict with that of the Board's witnesses, was credited by the Trial Examiner.

The basic issue before us is whether there is substantial evidentiary support upon the record as a whole for the Board's findings of violations of the Act. The law applicable to the charges has been considered and discussed frequently by this court and other courts and appears to be well settled. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, teaches that the findings of the Board must be supported by substantial evidence on the record as a whole; that the findings of the Trial Examiner are part of the record and that evidence supporting a conclusion may be less substantial when an experienced Trial Examiner, who has seen and heard the witnesses, reaches a contrary conclusion to that reached by the Board, and that this is particularly true when the credibility of witnesses is involved.

In Universal Camera, the Court expressly rejected the contention that a court is bound by the Board's rejection of a Trial Examiner's findings. It discusses the function of the Trial Examiner and the legislative history of the Act and goes on to say:

"We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The

'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case." 340 U.S. 474, 496, 71 S.Ct. 456, 469.

The Supreme Court directed that upon remand the Court of Appeals should "accord the findings of the trial examiner the relevance that they reasonably command in answering the comprehensive question whether the evidence supporting the Board's order is substantial."

■ Of course, the Board is not conclusively bound by the Trial Examiner's findings. However, in resolving the crucial issue of whether the Board's determination is based upon substantial evidence on the record considered as a whole, the Trial Examiner's findings which turn on credibility determinations with respect to witnesses whom he alone saw and heard, are entitled to considerable weight. N. L. R. B. v. Johnnie's Poultry Co., 8 Cir., 344 F.2d 617, 618; Wm. H. Block Co. v. N. L. R. B., 7 Cir., 367 F.2d 38, 42; Amco Electric v. N. L. R. B., 9 Cir., 358 F.2d 370, 373; Indiana Rayon Corp. v. N. L. R. B., 7 Cir., 355 F.2d 535, 537.

■ The Board is entitled to draw reasonable inferences from the evidence but some substantial evidentiary basis must exist to support the inferences drawn. Inferences cannot be based purely on speculation. Recently, in Dierks Forests, Inc. v. N. L. R. B., 8 Cir., 385 F.2d 48, 52, Judge Matthes for this court reviewed the scope of the *Universal Camera* substantial evidence standard and included a quotation from Judge

Blackmun's opinion in N. L. R. B. v. Council Mfg. Corp., 8 Cir., 334 F.2d 161, 165, reading in part:

"We have the impression that the Board of late has tended to overstretch on this type of issue and that, in the light of *Universal Camera,* a foundation of much greater substance is required than the isolated statement present here. We have refused enforcement in similar situations, particularly on interrogation, in recent cases."

What is there said, fully applies to our present case.

The resolution of the relevant fact issue here turns largely upon whether the testimony of the Board's witnesses or the conflicting testimony of President Kreiling is to be credited. The Examiner who heard the witnesses credited Kreiling's testimony. Sound reasons are set out in his report for so doing and they will not be repeated here. Board member Brown, in agreement with the Trial Examiner, states:

"There are, to be sure, suspicious circumstances attending the discharges of the complainants. But the testimony which the Trial Examiner has credited, and which I accept, provides lawful reasons for the terminations. In the face of these findings, I am unable to conclude that the record establishes by a preponderance of the evidence that the discharges were discriminatorily motivated. So finding, I must also agree with the Trial Examiner that the 8(a) (5) allegation of the complaint is insufficiently supported by the record."

A careful reading of the entire record convinces us that sound basis exists for crediting Kreiling's testimony and that no reasonable basis exists for upsetting the Trial Examiner's credibility finding.

The law pertaining to the § 8(a) (3) wrongful discharge issue is well-summarized in N. L. R. B. v. Superior Sales, Inc., 8 Cir., 366 F.2d 229, 233. Upon the basis of Kreiling's testimony corroborated in a number of respects by other witnesses, it is apparent that Acme

was concerned with the low production record of the plant when compared with its operations in prior years. McCulloch was employed in October 1965 to devise means to increase the productivity. At a December meeting of the employees Kreiling vigorously complained about the production inefficiency and attributed it to horseplay, talking on the job, and loafing, and he emphasized the need for immediate production improvement and the restoration of proper plant discipline. At a meeting of the hourly employees in early January 1966, Kreiling advised the employees that the production had deteriorated since the December meeting and that such condition could not be tolerated. Subsequently, five employees were discharged, all upon the basis of repeated violations of work rules, the most recent of which had occurred immediately prior to the discharge. The Examiner, upon the basis of substantial evidence, found that employee Stone voluntarily quit and that he was not discharged. Kreiling testified that the union activities had nothing whatsoever to do with any of the discharges. In crediting such testimony, the Examiner states, "the record before me does not permit of a finding that Kreiling was strongly hostile to the advent of the Union or was bent on retaliating through discriminatory action."

■ No threats of reprisal or promises of reward were made to thwart union activity. Kreiling specifically told employee Rice he was not going to fight the union. It is clear that the production rate had substantially deteriorated and that this greatly troubled Acme and made it difficult for it to remain competitive in its field of activity. We find no substantial evidentiary support for the Board's finding that any employee was discriminatorily discharged for union activity.

On the § 8(a) (1) coercive interrogatories issue, the Board offered evidence of two employees, Goodman and Dobbs, both of whom were interviewed by McCulloch on one occasion which was on the day Acme received the union's request for bargaining. Mr. Goodman's basic testimony as to such questioning is as follows:

"Q. What was said by Mr. McCulloch and what was said by you, if anything, at that time? A. Well, he told me that he supposed I knew that the union was trying to get in and I told him I did, and he said that he would say nothing either way about it, he thought everybody had a right to his own opinion, and he asked me how I felt about it and I told him I thought it would be a pretty good thing. And he asked me for what reason did I think that and I told him from the wage standpoint if from nothing else. And he just said, well, he wouldn't say anything either way, that he thought everyone had a right to their own opinion and that was all and I went back to work."

Dobbs testified that McCulloch said he was on fire over the union and that he asked Dobbs if he knew anything about the union, to which the response was, "I had heard talk, but did not know how strong it was." Dobbs further testified, "I asked Mr. McCulloch what he thought about it personally and he said he thought it might help and I think I told him I thought it was the only way things would straighten out."

Later that same day, at Dobbs' suggestion, Mr. Kreiling came to the plant. He called the employees together and showed them some projection charts and comparative prices to show why the company was having difficulty in maintaining its competitive position. He invited questions from the employees. There is no evidence that anything was said about union membership or activity.

■ Interrogation is a form of speech. We have no doubt that under appropriate circumstances, interrogation can be coercive and violative of the Act. In our present case, there is no substantial evidence of any coercive interrogation or speech on the part of the employer. No threats of reprisal or promises of reward were made. Nothing was said or asked which could reasonably be inter-

preted as hostile to union activity. Nothing said goes beyond the right of free speech guaranteed by § 8(c). See Dierks Forests, Inc. v. N. L. R. B., supra; N. L. R. B. v. Howard Quarries, Inc., 8 Cir., 362 F.2d 236, 240.

The Board predicates its decision on the § 8(a) (5) refusal to bargain charge upon its determination of § 8(a) (1) and § 8(a) (3) violations. Our conclusion that such determinations lack substantial evidentiary support removes the foundation upon which the § 8(a) (5) charge is based. On the same day that Acme received the letter requesting it to bargain, the union filed a request with the Board for an election. Acme's position, reflected in its letter of January 18, 1966, to the union is, "The matter should be further processed by the Board for the purpose of determining the issues involved." Such position has not been shown by substantial evidence to have been taken in bad faith.

The decision of the Board is reversed. Enforcement of the Board's order is denied.