**1046**

BASF WYANDOTTE CORPORATION,
Plaintiff-Appellant,

v.

LOCAL 227, INTERNATIONAL CHEMI-
CAL WORKERS UNION, AFL–CIO,
LeMountain, Joseph, President and in
his individual capacity and Scales, Rog-
er, Secretary and in his individual ca-
pacity, Defendants-Appellees.

No. 388, Docket 85–7214.

United States Court of Appeals,
Second Circuit.

Submitted Nov. 13, 1985.

Decided May 30, 1986.

Solotoff & Spivak, Great Neck, N.Y. (Joel Spivak, of counsel), for plaintiff-appellant.

Dominick Tocci, Albany, N.Y. (David Silberman, Laurence Gold, Washington, D.C., Sal Falletta, Akron, Ohio, of counsel), for defendants-appellees.

Before TIMBERS, KEARSE, and PRATT, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff BASF Wyandotte Corporation ("BASF") appeals from a judgment of the United States District Court for the Northern District of New York, Roger J. Miner, then-*District Judge*, dismissing its complaint seeking, principally, a declaration that a provision of its collective bargaining agreement with defendant Local 227, International Chemical Workers Union, AFL–CIO (the "Union"), requiring BASF to allow Union officials time off with pay for the purpose of conducting Union-related business other than direct meetings with BASF management (the "no-docking provision") violated § 302(a) of the Labor Management Relations Act, 1947 ("LMRA"), as amended, 29 U.S.C. § 186(a) (1982). The district court ruled that the no-docking provision was permitted by LMRA § 302(c)(1), 29 U.S.C. § 186(c)(1) (1982). On appeal, BASF renews its contention that the no-docking provision violated § 302(a). We conclude that the district

court's interpretation of § 302 was correct, and we therefore affirm.

## I. BACKGROUND

The material facts are not in dispute. BASF has operated a plant in Rensselaer, New York (the "Plant"), for the manufacture of chemicals since 1978. The Union has been the exclusive bargaining representative of the production and maintenance workers at the Plant since the 1940's, prior to BASF's purchase of the Plant. All of the Union's approximately 200 members are employed at the Plant. The Union's President and Secretary are full-time BASF employees elected from the ranks of the Union membership. When this action was filed in 1982, defendant Joseph LeMountain was the Union's President, and defendant Roger Scales was its Secretary.

From August 28, 1981, until August 31, 1984, the Union and BASF were parties to a collective bargaining agreement (the "Agreement"), which contained the following no-docking provision:

> Official representatives of the Union shall be permitted time as necessary during scheduled working hours to attend meetings with the Company. Representatives released for these purposes shall be paid for time spent in attending meetings with the Company to the extent that time spent at these meetings is during their regularly scheduled working hours, at their regular basic straight time rate, exclusive of all premiums and differentials.

> The Company will permit the Union President and/or Secretary time off to an aggregate of four (4) hours each day for the purpose of conducting union business during normal working hours on Company property, and will pay the time at regular basic straight time rate, exclusive of all premiums and differentials.

Pursuant to the Agreement, Union representatives have been released from work to meet with BASF representatives when necessary and have been paid their regular salaries for that time. BASF does not dispute its obligation to pay for employee time spent in such meetings. In addition, until mid-1982, LeMountain as President and Scales as Secretary were each released from work for two hours a day—an aggregate total of 20 hours per week—for the purpose of conducting Union business. In their depositions in the present case, LeMountain and Scales estimated that they spent approximately one to two of those 20 hours in meetings with management and spent the remaining 18 hours (1) preparing for Union activities by, for example, reading labor periodicals and investigating employee grievances, (2) conducting such intra-Union business as writing Union reports, preparing notices of Union meetings, and preparing for lawsuits against BASF, and (3) engaging in non-Union-related social activities such as making personal telephone calls and reading newspapers.

In September 1982, BASF adopted the position that § 302 of the LMRA and § 8(a)(2) of the National Labor Relations Act ("NLRA"), as amended, 29 U.S.C. § 158(a)(2) (1982), forbade it to pay the President and Secretary for time spent engaging in the last three categories of activities. Accordingly, BASF notified the Union that it would cease paying those officials for time spent on Union business other than labor relations meetings with BASF management.

The Union filed unfair labor practice charges against BASF with the National Labor Relations Board ("NLRB" or "Board"), alleging, *inter alia,* that BASF's unilateral repudiation of the Agreement's no-docking provision violated § 8(a) of the NLRA. In November 1982, the Board's General Counsel issued a complaint against BASF based on the Union's charges. A Board administrative law judge ("ALJ") subsequently found that BASF's repudiation of the no-docking agreement was a violation of § 8(a) of the NLRA, noting that he had no jurisdiction to determine BASF's contention that its repudiation was mandated by LMRA § 302. The ALJ's decision was affirmed and adopted by the

Board. *BASF Wyandotte Corp.*, 278 N.L. R.B. No. 28 (Jan. 22, 1986).

In the meantime, BASF filed the present suit in district court in December 1982, seeking a declaration that the no-docking provision of the Agreement "violates Section 302 ... insofar as provides [*sic*] for the payment of money to Union officials for time spent not in direct meetings with [BASF]," and requesting other relief subsidiary to such a declaration. Defendants filed a counterclaim seeking an injunction compelling BASF to comply with the no-docking provision and an award of damages in the amount of $100,000.

After conducting discovery, BASF moved for summary judgment. In an opinion reported at 591 F.Supp. 339 (N.D.N.Y.1984), the court denied BASF's motion, ruling that an employer's paying its employees their regular wages for time off to conduct union business did not present the type of opportunity for employer interference in union affairs that § 302 was designed to prevent, and that the payments in question fell within an exemption found in § 302(c)(1), permitting employer payments to a union officer if he is also an employee of the employer and the payment is made "by reason of" his service as an employee.

On the basis of this reasoning, defendants promptly moved for partial summary judgment in their favor, dismissing BASF's complaint. Defendants' motion was granted. Pursuant to Fed.R.Civ.P. 54(b), the court ordered that a final judgment be entered dismissing the complaint. This appeal followed.

## II. DISCUSSION

On appeal, BASF contends that the district court erred in construing § 302(c)(1) of the LMRA to permit the challenged no-docking provision. Our review of the language of § 302 and of its legislative history in the context of the history of other provisions in the bill that contained § 302 leads us to conclude that the district court correctly interpreted § 302 as not prohibiting no-docking provisions such as the present one, and we therefore affirm.

### A. *Section 302*

Section 302 of the LMRA, as amended, provides in part as follows:

(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce;

. . . .

(b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

29 U.S.C. §§ 186(a) and (b)(1). Section 302(c) sets forth a number of exceptions to §§ 302(a) and (b). Section 302(c)(1) makes the prohibitions of those two provisions inapplicable

in respect to any money or other thing of value payable by an employer to ... any representative of his employees, or to any officer or employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer; ....

29 U.S.C. § 186(c)(1). Thus, subsection (a) of § 302 makes it generally unlawful for an employer to make payments to an official of a union representing its employees, but subsection (c)(1) makes the general prohibition inapplicable if the union official is the employer's employee and the payments are compensation either "for" or "by rea-

son of" his service as an employee. While the boundaries of § 302(c)(1)'s exemption are not spelled out in the statute, we think its language and its fundamental logic suggest that no-docking provisions may fall within its protection.

It appears that in using the alternative formulations "for" and "by reason of," Congress intended to cover two general categories of employee compensation: (1) wages, *i.e.*, sums paid to an employee specifically for the work he performs, and (2) compensation occasioned by the fact that the employee has performed or will perform work for the employer, but which is not payment directly for that work. The latter category would include such employee "fring" benefits as vacation pay, sick pay, paid leave for jury duty or military service, pension benefits, and the like.

BASF points out, correctly, that many of the activities that employee union officials undertake, such as meeting with management, preparing for such meetings, reading labor periodicals, investigating employee grievances, writing union reports, and preparing for lawsuits against the employer, generally are not services *to* the employer, and that no-docking provisions with respect to time freed for these activities thus should not be deemed to provide compensation "for" an employee's services. As to § 302(c)(1)'s reference to compensation "by reason of" an employee's services, BASF contends that only the more commonly available fringe benefits should be included, and that payments for time off to be spent on union-related activities should be excluded because those activities are not services to the employer. We disagree with this contention because we think § 302(c)(1) is appropriately interpreted by focusing not on whether the activities to be engaged in during the paid period directly benefit the employer but on whether they are to be engaged in by one who is a bona fide employee of the payor.

To the extent that fringe benefits consist of payments to an employee for any period of time in which he is not doing the employer's work, such as vacation, or sick time, or military leave, the activities engaged in are plainly not direct services to the employer. Thus, on sick leave, the employee seeks to recover his own health; on jury leave, he seeks to serve his community; on military leave, he seeks to serve his country. While indirectly the employer may be benefited, the employee's activity during these periods is not service to the employer. Yet BASF concedes that payment for these periods is plainly sanctioned by § 302(c)(1).

The common element with respect to all of these more commonly available fringe benefits is simply that the person to whom the employer makes payment is [1] one who performs services as an employee. If he is an employee and is also a union official, an employer's payment to him, pursuant to a no-docking provision in a collective bargaining agreement, for time off to permit him to tend to union duties such as those listed above is not, in our view, different in kind from the employer's granting of such benefits as sick leave, military leave, or jury leave to its employees who are ill, military reservists, or prospective jurors. Just as jury leave is designed to permit the employee to serve his community, paid time off for the conduct of union business is designed to permit the union official to serve his fellow workers. BASF concedes that § 302(a) does not prohibit an employer from making payment to its employee who is a union official for time he spends in meetings with management. We see no meaningful distinction between time spent in meetings with management and time spent in preparing for those meetings, nor any principled distinction between the conduct of union-related business and the other types of paid-time-off activities discussed above. In short, nothing in § 302(c)(1)'s phrase "by reason of[ ] his service as an employee" suggests that no-docking provisions are not within the exemption provided by that section.

1. We ignore for purposes of this case the reference in § 302(c)(1) to "former" employees, since no-docking provisions have relevance only to persons who are currently serving as employees.

In construing subsection (c)(1), we must, of course, bear in mind the fundamental purpose of §§ 302(a) and (b), which is to prevent employers from paying union officials bribes. *See* Part II.B. below. Thus, in stating that the proper focus in interpreting § 302(c)(1) is whether the person to whom payments are made is an employee, we do not suggest that that section would allow an employer simply to put a union official on its payroll while assigning him no work. Such an official would not be a bona fide "employee" within the meaning of the statute, and this would be precisely the kind of device that §§ 302(a) and (b) were designed to prevent. Nor does the language of § 302(c)(1) appear to sanction such a device. The exception permits only compensation for or by reason of "service as an employee"; a union official who, though on the employer's payroll, performed no service as an employee, would not be within § 302(c)(1)'s exception. There has been no suggestion that such circumstances exist in the present case.

■ In sum, we see nothing in the language or logic of § 302(c)(1) to suggest that Congress did not intend to allow an employer to grant a bona fide employee who is a union official paid time off in order that he may attend to union duties. And, as discussed below, the inference that Congress did not intend § 302 to prohibit no-docking provisions is supported by the legislative history of Congress's labor enactments of 1947.

### B. *The Legislative History of § 302*

Section 302 was part of the LMRA as originally enacted in 1947. At that time, no-docking provisions in collective bargaining agreements were common, with approximately 40% of all industrial collective bargaining agreements containing such provisions. *Basic Patterns in Collective Bargaining Contracts* 15:127 (BNA ed. 1948). Congress was well aware that "[e]mployers generally ... allow representatives of the union, without losing pay, to confer not only with the employer but as well with employees, and to transact other union business in the plant." H.R. Rep. No. 245, 80th Cong., 1st Sess. 28–29 (1947) (discussing proposed amendment of § 8(2) of the original NLRA). We find nothing in the history of § 302 to indicate that Congress viewed such no-docking practices as abuses or that it intended to curtail them.

The original § 302 was introduced on the floor of the Senate as a proposed amendment to S. 1126, 80th Cong., 1st Sess. (1947) ("S. 1126"), a bill to amend the NLRA as originally enacted in 1935 ("1935 NLRA"). The proposed § 302 read, in pertinent part, as follows:

(a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce.

(b) It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value.

(c) The provisions of this section shall not be applicable (1) with respect to any money or other thing of value payable by an employer to any representative who is an employee of such employer, as compensation for, or by reason of, his services as an employee of such employer;....

93 Cong.Rec. 4804 (1947). The remainder of subsection (c) listed additional categories of exemptions.

In introducing this proposed amendment, Senator Ball, one of its authors, stated that § 302's "sole purpose" was to ensure the integrity of union welfare funds as trust funds for the benefit of the employees, and to ensure that payments by employers to the unions would not "degenerate into bribes." 93 Cong.Rec. 4805 (1947). Other senators echoed this understanding. *E.g.*, *id.* (statement of Sen. Byrd); *id.* at 4877 (statement of Sen. Taft). *See also Arroyo v. United States*, 359 U.S. 419, 425–26, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959) (noting only "corruption of collective bargaining

through bribery of employee representatives by employers, ... extortion by employee representatives, and ... possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control" as the congressional concerns that led to the enactment of § 302) (footnotes omitted).

With respect to subsection (c)(1), Senator Ball stated only that "[s]ubsection (c) contains certain exceptions. The first one is with respect to any money due a representative who is an employee or a former employee of the employer, on account of wages actually earned by him." 93 Cong. Rec. 4805 (1947). There was no further discussion of subsection (c)(1).

The Senate adopted the proposed § 302 in the above form, and passed S. 1126, including § 302, as amendments to H.R. 3020, 80th Cong., 1st Sess. (1947) ("H.R. 3020"), the House of Representatives bill to amend the 1935 NLRA. After the House voted to reject the Senate's amendments to H.R. 3020, the matter was sent to a conference committee. The conference committee recommended, *inter alia,* that § 302 be included in H.R. 3020, without changes in §§ 302(a), (b), and (c)(1) as adopted by the Senate. The only discussion in the conference committee's report relating to the exemptions provided by § 302(c) focused exclusively on provisions other than subsection (c)(1). *See* H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess. 66–67 (1947), *reprinted in* 1947 U.S.Code Cong.Serv. 1135, 1173. Sections 302(a), (b), and (c)(1) were eventually enacted as part of the LMRA in the form introduced by Senator Ball.

Although Congress was well aware of the widespread use of no-docking provisions, we have found no mention of such provisions in its discussions of any part of § 302. While Senator Ball's description of subsection (c)(1) as dealing with payments on account of "wages actually earned" by the employee could conceivably be read as support for the proposition that the subsection was intended not to sanction no-docking provisions, we do not believe it should be so read. We think that if Congress had

viewed no-docking provisions as being among the practices that §§ 302(a) and (b) were intended to eliminate, it would undoubtedly, in view of their known widespread use, have mentioned them in discussing the goals of subsections (a) and (b).

In sum, although we find the legislative history of § 302(c)(1), standing alone, little more informative than the subsection's language, we think the more reasonable inference from Congress's failure to mention no-docking provisions in connection with § 302 is that Congress did not intend § 302(a) to outlaw such provisions. There is, moreover, fairly plain indication in Congress's treatment of other sections of H.R. 3020 that Congress considered no-docking provisions to be legitimate practices to be encouraged.

## C. *The Legislative History of §§ 8(a)(2) and 10(c) of the NLRA*

While Congress was considering the proposed insertion of § 302 in what would become the LMRA, the 1935 NLRA already contained a related provision. Section 8(2) of the 1935 NLRA, which in 1947 was renumbered § 8(a)(2) of the NLRA, provided, as § 8(a)(2) does now, that it is an unfair labor practice for an employer to "dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it"; however, the section also provided expressly that it did not prohibit an employer from "permitting employees to confer with him during working hours without loss of time or pay." *See* 29 U.S.C. § 158(a)(2). In considering H.R. 3020's proposed amendments to the 1935 NLRA, Congress noted that many employers had taken an expanded view of § 8(2) and allowed paid time to union officials "to confer not only with the employer but as well with employees, and to transact other union business in the plant." H.R.Rep. No. 245, 80th Cong., 1st Sess. 29 (1947). Paid time for these additional activities, however, generally was given only to officials of national or international unions and their local affiliates and was denied to officials of indepen-

dent or company unions. *Id.* Indeed, the NLRB had sanctioned the expansion of paid time for officials of the former group of unions but not for officials of non-affiliated unions. H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess. 40 (1947), *reprinted in* 1947 U.S.Code Cong.Serv. 1146.

H.R. 3020 contained various proposals designed to amend the 1935 NLRA with respect to these paid-time expansions. These included a proposed modification of § 8(2) that would have prohibited financial assistance to union officers only if that assistance was offered "for the purpose of perverting [the union officer's] judgment or corrupting his conduct," H.R. 3020, as initially reported to the House, at 20, and a proposed amendment to § 10(c) to bar the NLRB from issuing orders against "independent" unions that would not be issued "in similar circumstances ... with respect to a labor organization national or international in scope," H.R. 3020, as initially reported to the House, at 39. The proposal advanced in S. 1126 (which the Senate passed as amendments to H.R. 3020) included no amendment to § 8(2), but consisted simply of a proposed amendment to § 10(c) that made it clear that the two types of unions should be treated the same. The Senate proposal required that

> in determining whether a complaint shall issue under section 8(a)(1) or section 8(a)(2), and in deciding such cases, the same regulations and rules of decision shall apply irrespective of whether or not the labor organization affected is affiliated with a labor organization national or international in scope.

H.R. 3020, as amended by the Senate, at 95–96 (italics omitted). The conference committee subsequently adopted the Senate's approach. Thus, § 101 of H.R. 3020 as adopted by Congress contained the Senate version of § 10(c), and there was no amendment of § 8(2).

BASF asks us to infer from these events that Congress disapproved of the expansion of paid time to union officials for union business other than attendance at meetings with management on the ground

that Congress (a) did not adopt the House proposal to prohibit only payments made for the purpose of bribery, and (b) did not take that opportunity to insert in § 8(a)(2) express authorization of payments for time to be spent on union-related business other than attendance at meetings with management. We conclude that the correct inference is precisely the opposite. The House Conference Report, explaining the conference committee's rejection of the House proposals and adoption of the Senate version as § 101 of H.R. 3020, stated as follows:

> The House bill amended section 8(2) ... for the purpose of according some protection to labor organizations which were not affiliated with one of the national or international labor organizations. *This provision of the House bill had the effect of permitting an employer to do the same kinds of things for independent unions which the Board has permitted him to do for the affiliated unions.*
>
> . . . .
>
> ... *The Board has, for example, in the case of affiliated unions permitted employers* to provide bulletin boards in their plants for the union's use, to give union officials preferred treatment in laying off workers and calling them back, and *to allow shop stewards without losing pay to confer not only with the employer but with the employees as well, and to transact other union business in the plant.* The Board has not permitted the employer to do the same things for nonaffiliated unions, and it was the purpose of the House provision to provide for equality of treatment in this respect.

H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess. 40 (1947) (emphasis added), *reprinted in* 1947 U.S.Code Cong.Serv. 1146. The report stated that § 8(2) was not amended because the Senate version of § 10(c) "adequately dealt with" these matters. *Id.* at 41, *reprinted in* 1947 U.S.Code Cong.Serv. at 1146.

This report makes it plain that the fact of the expansion of paid time to include union-related business other than attendance at meetings with management was not in the least disapproved by Congress. What Congress disapproved was the disparity in treatment of affiliated and nonaffiliated unions; the amendment eventually incorporated in H.R. 3020 was designed to require that nonaffiliated union officials be given the same privileges as affiliated union officials. The conference report makes clear that both branches of Congress envisioned that these privileges would continue to be the expanded ones granted in practice rather than solely the one of attendance at meetings with management provided in § 8(2) and that the expanded privileges would become more widely available.

In light of Congress' manifested intent in adopting § 101 of H.R. 3020 to increase the availability of expanded no-docking provisions similar to the one at issue here, we cannot reasonably conclude that Congress intended § 302 of the same bill to ban such provisions.

### D. *Amendments to § 302*

Section 302 of the LMRA has been amended several times since 1947, and the amendments and their legislative history are consistent with the view that Congress did not intend that section to be read as prohibiting no-docking provisions such as the one at issue here. In enacting amendments in 1959, which put subsections (a) and (b) in their present form, and in 1969 and 1973, which added categories of exemptions to subsection (c), Congress reaffirmed the purpose of § 302 as the limited one of "prevent[ing] bribery, extortion, shakedowns, and other corrupt practices." H.R. Rep. No. 286, 91st Cong. 1st Sess. 1–2, *reprinted in* 1969 U.S.Code Cong. & Ad. News at 1159–60; *see* S.Rep. No. 139, 93d Cong., 1st Sess. 1, *reprinted in* 1973 U.S. Code Cong. & Ad.News 2004; *see also* S.Rep. No. 187, 86th Cong. 1st Sess. 13, *reprinted in* 1959 U.S.Code Cong. & Ad. News 2318, 2329 (to prohibit "all forms of extortion and bribery in labor-management

relations"). We have found in the legislative history of these amendments no congressional criticism of the employer practice of granting employee union officials paid time for the purpose of conducting union business.

The most recent amendment to § 302, enacted as part of the Labor Management Cooperation Act of 1978, added another new exception to subsection (c), allowing employers to make payments to joint labor-management committees established for purposes of "improv[ing] communication between representatives of labor and management; ... enhanc[ing] the involvement of workers in making decisions that affect their working lives; ... [and] expand[ing] and improv[ing] working relationships between workers and managers." Pub.L. No. 95–524, § 6, 92 Stat. 1909, 2020–21 (1978). These purposes are little different from those underlying no-docking provisions.

### E. *Adjudicative Interpretations of § 302*

We are aware of only two cases, one a district court case and one a Board case, that have dealt with the lawfulness of no-docking provisions under § 302. In each case, the no-docking provision was held not to violate § 302. *See Employees' Independent Union v. Wyman Gordon Co.*, 314 F.Supp. 458, 460–61 (N.D.Ill.1970); *BASF Wyandotte Corp.*, 274 N.L.R.B. No. 147, slip op. at 5–6 (Mar. 15, 1985). *See also United States v. Motzell*, 199 F.Supp. 192, 197–98 (D.N.J.1961) (acquitting union official of criminal charges under § 302(b) on the ground that he was an employee of the paying company, received only wages and travel reimbursement, and performed services for the company by securing workers to meet its production needs).

We note also that the courts and the Board have repeatedly held that no-docking provisions such as the one at issue here— negotiated on an arm's-length basis and authorizing pay for time that is spent on union business—do not constitute unfair labor practices under § 8(a)(2) of the NLRA. *See, e.g., NLRB v. Homemaker*

*Shops, Inc.,* 724 F.2d 535, 546–47 (6th Cir. 1984); *NLRB v. Northeastern University,* 601 F.2d 1208, 1214 (1st Cir.1979); *Chicago Rawhide Mfg. Co.,* 221 F.2d 165, 170 (7th Cir.1955); *NLRB v. Valentine Sugars, Inc.,* 211 F.2d 317, 324–25 (5th Cir.1954); *Wayside Press, Inc. v. NLRB,* 206 F.2d 862, 866 (9th Cir.1953); *Sunnen Products, Inc.,* 189 N.L.R.B. 826, 828 (1971); *Ladish Co.,* 180 N.L.R.B. 582, 584–85 (1970); *Hesston Corp.,* 175 N.L.R.B. 96, 96 (1969).

We see no merit in BASF's reliance on cases such as *Reinforcing Iron Workers Local Union 426 v. Bechtel Power Corp.,* 634 F.2d 258 (6th Cir.1981) *("Bechtel"),* which found § 302 violated by an employer's payments to persons or entities who were not its employees. As discussed in Part II.A. above, § 302(c)(1) focuses only on union officials who are employees of the paying employer. We note that the Board adopted this rationale in *BASF Wyandotte Corp.,* 274 N.L.R.B. No. 147, which involved BASF's unilateral repudiation of no-docking provision similar to that at issue here. The Board concluded that § 302 did not provide BASF a defense to the ensuing unfair labor practice charges, distinguishing *Bechtel* as follows:

> That case is significantly different from the one before us, in that here the recipients of the various privileges extended by BASF were employees of BASF who served as union stewards, committeemen, or chairman. These individuals would not have received these privileges, such as paid time to attend to grievances of unit employees, but for the fact that they were employees of BASF. Accordingly, we conclude that the money or other things of value that BASF provided in the way of privileges are encompassed within the exception set forth in Section 302(c)(1) for payments made as compensation for, or by reason of, the services of union officers as employees of the employer.

Slip op. at 5–6. It concluded that "a contrary holding, finding violative of Section 302 the provision by an employer of privileges such as paid time for stewards to discuss grievances with employees, would be inimical to the statutory goal of encouraging cooperative labor relations." *Id.* at 6.

## CONCLUSION

For the above reasons, we conclude that the no-docking provision of the Agreement was not unlawful under § 302 of the LMRA. The judgment of the district court dismissing the complaint is affirmed.