**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BASF WYANDOTTE CORP., Respondent.**

No. 85–4503.

United States Court of Appeals, Fifth Circuit.

Sept. 2, 1986.

---

man, Baton Rouge, La., William Jenkins, Corporate Dir. of Industrial Relations, Parsippany, N.J., for respondent.

Fred A. Lewis, Dir., N.L.R.B., New Orleans, La., other interested persons.

Before JERRE S. WILLIAMS, E. GRADY JOLLY and PATRICK E. HIGGINBOTHAM, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Petitioner National Labor Relations Board (NLRB) seeks enforcement of its order decreeing that respondent BASF Wyandotte Corp. (company) committed unfair labor practices in violation of § 8(a)(5) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(5). We grant enforcement of the order.

## I. FACTS

The company owns a chemical plant in Geisman, Louisiana. It has a collective bargaining agreement with the Oil, Chemical, and Atomic Workers' Union Local 4–620 (union). Harold Nickens was union chairman until July 1983, when he resigned and was replaced by Esnard Gremillion.

The day after Gremillion took office, he was informed by the company's Manager of Human Resources that he would not be allowed the same privileges that Nickens had been allowed. Gremillion was not allowed four hours of paid time per day to conduct union business, and he could be released from his job duties for union business only with permission of both his immediate supervisor and the company's Manager of Human Resources. Gremillion was told that he would not be paid for time spent conducting union business, except for a fifteen minute meeting with employees immediately prior to a grievance proceeding. The office and telephone which Nickens had been given on company property and the right to use a company copying machine were taken from Gremillion. The

John S. Gill, Elliott Moore, Deputy Associate General Counsel, NLRB, Washington, D.C., for petitioner.

David M. Silberman, Washington, D.C., for intervenor.

William R. D'Armond, Kean, Miller, Hawthorne, D'Armond, McCowan & Jar-

company informed Gremillion that the privileges granted to Nickens had been personal to him, and that, in any event, supplying these privileges was prohibited by § 302 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 186.

Article 3.6 of the 1981 collective bargaining agreement provides that workers' committee members, stewards, and the chair of the workers' committee "shall be allowed a reasonable amount of time during working hours, without loss of pay, for the purpose of conferring with aggrieved employees or complainants and/or representatives of the Company relative to any complaints or grievances filed by an employee or employees. The Chairperson, a Committeeperson, or Steward leaving work for these purposes shall first obtain permission as soon as working conditions reasonably permit, and . . . upon returning to their work shall report to their supervisor immediately."

The union attempted to resolve this dispute through grievance procedures, but the company denied the grievance. The company stated that its narrow interpretation of the contract provision could not be at issue because otherwise the provision was illegal. The union then filed an unfair labor practice charge with the NLRB alleging that the company had violated §§ 8(a)(1) and 8(a)(5) of the NLRA by unilaterally terminating privileges formerly extended to the union. An administrative law judge (ALJ) found that the company had violated § 8(a)(5) of the Act by unilaterally requiring union representatives to get permission from the company's Manager of Human Resources before engaging in union business; by unilaterally discontinuing the union's use of the office, telephone, and copying machine; and by unilaterally refusing permission to union representatives to conduct union business on company time. The ALJ found that the company's failure to bargain about the disallowance to Gremillion of four hours paid time per day

for union business was not an unfair labor practice because the paid time was illegal under § 302 of the LMRA and § 8(a)(2) of the NLRA.

Both the union and the company appealed the ALJ's decision to the NLRB. The Board reversed the ALJ on the issue of four hours paid time. It held that four hours with pay per day to conduct union business was not a violation of § 302 or § 8(a)(2) and was not an illegal subject of bargaining and that the unilateral discontinuance of that practice was an additional § 8(a)(5) violation. In all other respects, the Board upheld the findings of the ALJ. The Board ordered the company to cease and desist from the unfair labor practices found; to reinstate the privileges formerly granted to the union that it had unilaterally rescinded; and to post appropriate notices. The Board denied, pending compliance proceedings, the company's motion for reconsideration and for stay of remedy. The Board granted the union's motion that the company reimburse the union for the four paid hours per day that the union had paid to Gremillion.

On appeal to this Court, the company contends that both the ALJ and the Board erred because: (1) the practices formerly granted to the union chairman were illegal under § 302 of the LMRA and § 8(a)(2) of the NLRA and therefore were not subject to bargaining; and (2) in any event, the collective bargaining agreement covers these subjects, so although the union may have a claim for breach of contract, it has no claim under the NLRA.

## II. DUTY TO BARGAIN: ILLEGALITY CLAIM

 Section 8(d) of the NLRA provides that the employer and the employee representative are obligated to bargain "with respect to wages, hours, and other terms and conditions of employment."[1] Paid time to union stewards for perform-

---

**1.** Although the NLRA does not expressly define the phrase "other terms and conditions of employment," substantial jurisprudence has evolved defining several categories of items that are considered mandatory subjects of bargain-

ing. For example, wage rates, hours of employment, procedures and practices relating to discharge and suspensions, procedures and practices covering safety, sanitation, and health, vacations, holidays, leaves of absences, jury duty,

ance of union duties is a mandatory subject of bargaining under § 8(d). *See Axelson, Inc.,* 34 NLRB 414 (1978), *enforced, Axelson v. NLRB,* 599 F.2d 91 (5th Cir.1979).

■ In addition, § 8(d) makes bargaining mandatory in the context of the present case because bargaining is required over an attempt to modify a provision or change an established practice in an existing collective bargaining agreement.[2] The collective bargaining agreement provides for "a reasonable amount" of paid time to be allowed union officials to conduct union business. The privileges at issue had been granted to the local chairman of the union since Nickens took office in 1976. Where a collective bargaining agreement embodies a particular working condition and past practice demonstrates that an employer had administered that working condition in a particular manner, the employer is forbidden from changing that condition unilaterally. *NLRB v. Dothan Eagle, Inc.,* 434 F.2d 93, 98 (5th Cir.1970); *NLRB v. Frontier Homes Corp.,* 371 F.2d 974, 978 (8th Cir. 1967); *see also Axelson,* 599 F.2d at 95 (contract interpreted in light of past practices).

■ There is evidence in the record that the prior incumbent, Nickens, used the sup-

---

and sick leave are considered mandatory subjects. In addition, union security is an important subject of collective bargaining, as is the right to present grievances. We have held that the theme common to mandatory subjects is that they "benefit all of the members of the bargaining unit through encouraging the collective bargaining process and vitally affecting the relationship between the employer and employees." *Axelson,* 599 F.2d at 94.

Subjects which lawfully may be included in a labor contract but fall outside the area of "wages, hours, and other terms and conditions of employment" are classified as permissive subjects of bargaining. Permissive subjects may be proposed at the bargaining table by either party, but "the proponent may not insist on its position to the point of impasse or as a condition of reaching a agreement, and the other party may decline to discuss the issue altogether without violating the law." R. Gorma, *Basic Text on Labor Law* p. 523 (1976).

A final category consists of illegal subjects. Illegal subjects cannot be bargained over, and any party that insists upon inclusion of such a provision as a condition of a agreement has committed an unfair labor practice in violation of § 8(a)(5) or § 8(b)(3). *Id.* at 530. Examples of illegal subjects are certain forms of union security prohibited by the Act such as closed shops and preferential hiring (except under certain circumstances in the building and construction industry). In addition, union shop, agency shop, maintenance-of-membership agreements, check-offs which do not meet the statutory requirements, or any other practice forbidden by the Act is an illegal subject and cannot amount to a mandatory or permissive subject of bargaining. *See* 1985 *Guidebook to Labor Relations,* (CCH) ¶ 1202 (citing cases).

2. Section 8(d) of the NLRA provides, in pertinent part:

[W]here there is in effect a collective-bargaining contract covering employees in a industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

(2) offers to meet or confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later.

29 U.S.C. § 158(d).

The company did not comply with any of the procedures outlined in § 8(d) but instead proceeded unilaterally to modify its prior performance under the collective bargaining agreement. Even had the company complied with § 8(d) notification procedures, its unilateral modification of a condition "contained in" an existing collective bargaining contract would violate § 8(d). *C & S. Indus., Inc.,* 158 N.L.R.B. 454 (1966). If a subject is "contained in" an existing agreement, "it is illegal for the employer to alter working conditions in midterm—even if it has given notification to the union...." R. Gorman, *Basic Text on Labor Law* p. 464.

plied office and telephone and the four hours a day paid time in part at least for his own purposes and not to carry out union business. The consideration of this evidence is not called for in this case. The evidence has no relevance to the decision of the NLRB. The sole issue is whether a change by the company in practices it and the union had recognized in the past could be made unilaterally by the company or was something about which the company had to bargain. If Nickens had in the past made a sinecure of his office, this did not mean bargaining was on the ground that the union was in any way demanding that the local chairman be supplied these perquisites for his personal use rather than for the benefit of his service to the union. Thus, for purposes of our analysis we must assume, just as the NLRB assumed, that if the evidence concerning Nickens was true, it was a matter of personal misconduct and not a matter of union-company agreement. There simply can be no evidence in support of the latter possibility until after bargaining, when the nature of the demands is revealed.

■ The company has never disputed that absent illegality, the practices at issue in the present case constitute mandatory subjects of bargaining. Rather, the company argues that § 302 of the LMRA and § 8(a)(2) of the NLRA prohibit the practices which the union seeks to reinstate. The company is inescapably correct in its assertion that no employer may be required to bargain over or engage in illegal activity even if that activity is necessary to comply with the terms of the bargaining agreement. *Iron Workers v. Bechtel Power,* 634 F.2d 258 (6th Cir.1981). We, therefore, evaluate the company's assertion that supplying these perquisites for the carrying out of union business nevertheless violates § 302.

Section 302 provides in pertinent part:

(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative or any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

Section 302(c)(1) provides an exception from this prohibition for payments by an employer to any representative of its employees when that person is an employee of the employer and the payment is made as compensation for "his services as an employee."[3] The union's position is that

---

3. 29 U.S.C. § 186(c)(1) provides:

**Exceptions**

The provisions of this section shall not be applicable (1) in respect to any money or other thing of value payable by an employer to any of his employees whose established duties include acting openly for such employer in matters of labor relations or personnel administration or to any representative of his employees, or to any officer or employee of a labor organization, who is also an employee or a former employee of such employer, as compensation for, or by reason of, his services as an employee of such employer.

these practices are not outlawed by § 302 because they are permitted under the § 302(c)(1) exception. The company responds that the phrase "services as an employee" in § 302(c)(1) means that the exception applies only to payments made to union representatives for face to-face meetings with management.

On facts almost identical to the present case, the Second Circuit Court of Appeals has rejected the company's argument that § 302 of the LMRA and § 8(a)(2) of the NLRA outlaw payments made to union representatives by employers which go beyond face to face union/management meetings. *BASF Wyandotte Corp v. Local 227, International Chemical Workers Union,* 791 F.2d 1046 (2nd Cir.1986). In that case, BASF had a provision in the collective bargaining agreement which provided that the union president and secretary would be given four hours paid time per day during normal working hours of the company for the purpose of conducting union business. The company asserted it had decided that this provision violated § 302 of the LMRA, and it discontinued that practice. The union filed an unfair labor practice charge against BASF with the NLRB. BASF then filed suit in district court seeking a declaratory judgment that the four hours paid time in the collective bargaining agreement (the "no-docking" provision) violated § 302. The Second Circuit held that such payments do not violate § 302 because they come within the exception in § 302(c)(1) for payments to employees "for, or by reason of, his service as an employee of such employer."

The court first analyzed the statute logically, noting that the § 302(c)(1) exception applies to many fringe benefits—such as vacation time, sick time, military leave, and jury duty—which no more directly benefit the employer than does union business. The common thread in all of these fringe benefits was "simply that the person to whom the employer makes payment is one who performs services as an employee." *Id.* at 1049. The court noted that, "just as jury leave is designed to permit the employ-

ee to serve his community, paid time off for the conduct of the union business is designed to permit the union official to serve his fellow workers." *Id.*

The Second Circuit next bolstered its analysis through the legislative history of § 302. Section 302 of the LMRA, it made clear, was not intended to prohibit the types of practices at issue in the present case. At the time of enactment of § 302, Congress was well aware that "[e]mployers generally ... allow representatives of the union, without losing pay, to confer not only with the employer but as well with employees, and to transact other union business in the plant." H.R.Rep. No. 245, 80th Cong., 1st Sess. 28–29 (1947). As the court noted, there is "nothing in the history of § 302 to indicate that Congress viewed such no-docking practices as abuses or that it intended to curtail them." 791 F.2d at 1050. The intent of § 302 was to "insure the integrity of union welfare funds as trust funds for the benefit of the employees, and to insure that payments by employers to the unions would not 'degenerate into bribes.'" *Id.* (quoting 93 Cong. Rec. 4804 (1947)). Subsequent amendments to § 302 have reaffirmed the purpose of § 302 as the limited one of "prevent[ing] bribery, extortion, shakedowns and other corrupt practices." *See e.g.,* H.R.Rep. No. 286, 91st Cong., 1st Sess. 1–2, *reprinted in* 1969 U.S.Code Cong. & Admin.News at 1159–60.

The test of illegality is not whether the payments compensate only for face-to-face labor/management meetings; but, rather, "§ 302(c)(1) is appropriately interpreted by focusing not on whether the activities to be engaged in during the paid period directly benefit the employer but on whether they are to be engaged in by one who is a bona fide employee of the payor." *BASF Wyandotte v. Local 227,* 791 F.2d at 1049; *see also Trailways Lines, Inc. v. Trailways Inc.,* 785 F.2d 101 (3rd Cir.1986). In the present case, the company does not contend that Gremillion is not a "bona fide

employee" of the company.[4] The *BASF Wyandotte v. Local 227* case simply confirmed a long line of NLRB and court authority. 791 F.2d at 1053. We therefore reject the company's position that the privileges at issue are illegal under § 302.

Applying the same analysis, we also reject the company's argument that § 8(a)(2)[5] of the NLRA outlaws these privileges. The legislative history of § 8(a)(2) makes clear that Congress intended it, much as § 302, to be a provision prohibiting bribery and company dominated unions, not prohibiting the kind of labor/management cooperation necessary to collective bargaining as is at issue in the instant case. *BASF Wyandotte v. Local 227*, 791 F.2d at 1051–1053.

The company makes no claim that Gremillion has shown favoritism in carrying out his duties. Indeed, as the Board found, the evidence indicates that the union "clearly is an independent entity with a well-established history of arm's-length dealing with BASF...." The practices discontinued by the company have not been shown to have had the purpose of furthering bribery and corruption of union representatives as intended to be prevented by

§ 302 and § 8(a)(2). This is so as to the circumstances of the case as they are now before us regardless of the unevaluated evidence concerning Nickens. Consequently, the practices at issue are not outlawed by either the LMRA or the NLRA.

We emphasize that it is not for us at this stage of the case to try to place limitations upon the bargaining on the ground that demands may be so unrealistic that insistence upon them establishes a refusal to bargain in good faith. It may be that union representation needs less in its perquisites than those granted by the company to Nickens. We point out again, however, that each element of those perquisites, the four hours paid per day for union business, an air conditioned office with telephone, the use of the copying machine, and the right to deal with employees without company permission, is justifiable and is lawful in many industrial situations.

The issue, then, is good faith bargaining about the perquisites. That issue cannot be decided by the NLRB or this Court in advance of the bargaining. We are not at this time concerned at all with the substantive aspects of the bargaining. We have authority only to consider whether bargaining was required in lieu of the company's

---

4. A union official put on an employee payroll but assigned no meaningful work for the employer would not amount to a "bona fide employee," and payments to him would violate § 302. *BASF Wyandotte*, 791 F.2d at 1050.

5. The original § 8(a)(2), then § 8(2) of the 1935 NLRA, provided that it was an unfair labor practice for an employer to "dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." That section also provided that it did not prohibit an employer from "permitting employees to confer with him during working hours without loss of time or pay." The provision as renumbered in 1947 as § 8(a)(2) of the NLRA keeps the same wording. *See* 29 U.S.C. § 158(a)(2).

The original § 302 was introduced as a proposed amendment to the 1935 NLRA. In considering this amendment, Congress noted that many employers had taken an expanded view of § 8(2), and allowed paid time to union officials "to confer not only with the employer but as well with the employees, and to transact other union business in the plant." H.R.Rep. No. 245,

80th Cong., 1st Sess. 29 (1947). Paid time for these additional activities, however, generally was given only to officials of national or international unions and their local affiliates and was denied to officials of independent or company unions. *Id.*

Congress did not amend § 8(2). Rather, the proposal adopted by Congress became § 302 of the LMRA. The House Conference Report "makes it plain that the fact of the expansion of paid time to include union-related business other than attendance at meetings with management was not in the least disapproved by Congress. What Congress disapproved was the disparity in treatment of affiliated and nonaffiliated unions ..." *BASF Wyandotte*, 791 F.2d at 1053. "The conference report makes clear that both branches of Congress envisioned that these privileges would continue to be the expanded ones granted in practice rather than solely the one of attendance at meetings with management provided in § 8(2) and that the expanded privileges would become more widely available." *Id; see* H.R.Conf.Rep. No. 510, 80th Cong. 1st Sess. 40 (1947), *reprinted in* 1947 U.S. Code Cong.Serv. 1146.

**857**

unilateral changes. On this narrow issue, the law is clear and the NLRB order correctly enforces it.

### III. ONLY A CONTRACT VIOLATION?

The company next urges that this case involves only a contract violation and not an unfair labor practice. We find this position to be without merit. First, the company's argument represents a reversal of the reasons it gave for the unilateral changes to the union in 1983. When the union in 1983 filed a grievance contending that the changes violated the contract, the company stated that the changes were not made because of the contract, but because it believed the privileges formerly given to Nickens were illegal. The company then refused to accept the grievance. Thus, it is the company's own adamant refusal that barred the issue of contract violation from properly being considered through the grievance procedures. There is no authority justifying the company's claimed right now to reverse its prior position and start all over, after full litigation is completed, with a claim that the dispute should have been submitted to the grievance procedures it itself denied.

In any event, the company's argument rests upon the faulty premise that a contract violation cannot amount to a § 8(a)(5) violation. This view has been expressly rejected by the Supreme Court. Where the contract violation is also a unilateral change by the employer in working conditions subject to mandatory bargaining, as is the situation in this case, there can be both a contract violation and a § 8(a)(5) violation. *NLRB v. C. & C. Plywood Corp.*, 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967).

Nor does the fact that this dispute arose during the term of a negotiated collective bargaining agreement bar the obligation to bargain. An employer is not permitted to make unilateral changes as to contract terms which are mandatory subjects of bargaining during the term of the agreement. There is a continuing duty to bargain on such subjects during the agreement if the employer desires to change them. *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 436, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967).[6] Indeed, § 8(d) of the NLRA provides that the employer must bargain in good faith with respect to questions arising under existing agreements. *See* text accompanying note 2, *supra.* Under § 8(d), the "true interpretation of a contract, as well as requested modifications, must be bargained collectively." *See* 1985 *Guidebook to Labor Relations* (CCH) ¶ 1202.

The company urges that the union agreed that the privileges were personal to Nickens and would automatically cease when Nickens left the chairman position. The ALJ, affirmed by the Board, found that no such agreement had been made. There is evidence in the record to support that determination. "Credibility resolutions are peculiarly within the province of the [administrative law judge] and the National Labor Relations Board and are entitled to affirmance unless inherently unreasonable or self-contradictory." *NLRB v. Proler International Corp.*, 635 F.2d 351, 355 (5th Cir.1981). Because we do not find the determinations of the ALJ and the Board to be unreasonable or self-contradictory, we must accept those factual findings.

### IV. COMPLIANCE

The company contends that it reinstituted the practices susceptible to reinstitution[7] and then bargained to im-

---

6. Of course, in the absence of any attempt to make a unilateral change, the employer is not obligated to bargain about modifications to the collective bargaining agreement that the union proposes while the bargaining agreement is in force. *See* 29 U.S.C. § 158(d); R. Gorman, *Basic Text on Labor Law* p. 457.

7. The company states that the four hours paid time to the union chairman was not susceptible of reinstitution because, at the time of the Board's decision, a lockout had commenced and the union chairman was not working. The company states that it fully bargained about this

passe with the union over them upon expiration of the collective bargaining agreement. The company complains that the Board has ordered it to redo what it has already done. We do not address this issue because it is most appropriately left to determination by the Board during the compliance stage of the proceedings. *See NLRB v. Mangurian's, Inc.*, 566 F.2d 463, 468 (5th Cir.1978).

## V. CONCLUSION

We reject the company's argument that the perquisites the company has denied the local chairman, Gremillion, are shown to be illegal under § 302 or § 8(a)(2). We hold that the Board was justified in finding that the company had violated § 8(a)(5) by making unilateral changes in the perquisites provided union representatives. We stress that the issue before the Board was whether the company had the obligation to bargain with the union about removal of the perquisites it had in the past furnished to the local union chairman. We only enforce the NLRB order requiring the company to bargain with the union as required by the NLRA instead of making unilateral changes in the interpretation of the collective agreement. We do not define legal limitations upon the bargaining. That must await possible challenge to the substantive bargaining process itself.

The Board's remedy ordered the employer to reimburse the union for four hours per day which the union had paid to Gremillion and to restore the privileges granted under the Nickens administration. This action was proper in that it preserved the status quo existing before the unilateral changes. The order of the Board is

ENFORCED.

E. GRADY JOLLY, Circuit Judge, specially concurring:

I concur in Judge Williams' carefully and narrowly written opinion that decides only that the unilateral withdrawal of an established benefit whose nature relates to issue in negotiations for a new collective bar-

wages, hours and working conditions is an unfair labor practice. I write specially to express concern, however, that the particular practices in question are probably excessive in relation to their stated purpose. The benefit is estimated to be worth $20,000 per year. It includes four hours of paid time each day to process slightly more than one grievance per week. It includes a telephone and an airconditioned office that hardly appear necessary to process the few grievances arising on the floor of the plant where the union representative may conveniently visit the workers. In short, the company seems to be paying a substantial part of the union's administrative expenses. If this is so, then the benefit may exceed *in quantum* what the union can require the company to bargain over. But, as Judge Williams notes, this is an issue for another day; it is a fact specific question that cannot subsume the issues presented by the unilateral withdrawal of an established benefit that is reasonably related to wages, hours and working conditions. Because Judge Williams has written narrowly, I concur in the conclusion that the company violated section 8(a)(5) of the National Labor Relations Act when it unilaterally withdrew an established benefit.